IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:07-CV-275-D

| | | |
|---|---|---|
| SILICON KNIGHTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| EPIC GAMES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

This case comes before the court on a motion (D.E. 531) by defendant and counterclaim

plaintiff Epic Games, Inc. ("Epic") for partial summary judgment, pursuant to Fed. R. Civ. P. 56.[1]

It is supported by a memorandum (D.E. 532) and substantial evidentiary materials.[2] Plaintiff and

counterclaim defendant Silicon Knights, Inc. ("SK") filed a memorandum in opposition (D.E. 559),

itself supported by substantial evidence.[3] Epic filed a reply memorandum (D.E. 568) with an

---

[1] The court relies throughout this Memorandum and Recommendation on the version of Rule 56 that was in effect through 30 November 2010. Although the Rule was amended effective 1 December 2010, Epic's motion is based on the prior version of the Rule and the amendments do not affect the substantive standards applicable to the motions. *See* Fed. R. Civ. P. 56, Advisory Comm. Notes, 2010 Amend. ("The standard for granting summary judgment remains unchanged. . . ."); *see also* Order Amending Fed. R. Civ. P. (U.S. 28 Apr. 2010) ("[T]he foregoing amendments to the Federal Rules of Civil Procedure shall take effect on December 1, 2010, and shall govern in all proceedings thereafter commenced and, *insofar as just and practicable,* all proceedings then pending." (emphasis added)).

[2] The evidence consists of the declarations of four individuals (D.E. 537-2 to -5); deposition transcripts, exhibits, expert reports, and pleadings (D.E. 532-1 to -20; D.E. 533-1 to -18; D.E. 534-1 to -12; D.E. 535-1 to -15; D.E. 536-1 to -4; and D.E. 537-1 to -12); and unreported cases (D.E. 538).

[3] The evidence consists of declarations by two individuals (D.E. 559-2 to -3); deposition transcripts, exhibits, expert reports, and pleadings (D.E. 559-3 to -15; D.E. 560-1 to -20; D.E. 561-1 to -15; D.E. 562-1 to -15; D.E. 563-1 to -17; D.E. 564-1 to -9); and unreported cases (D.E. 565). Although the exhibits SK filed are in numerical order, there are gaps in the sequence. SK explains in its index of exhibits (Index (D.E. 559-1) n.1) that if Epic had already filed a copy of a document SK was relying on as an exhibit, SK did not file another copy of it, but instead simply refers to such an exhibit in the index list by title and docket entry number.

additional declaration and case law.[4] The motion was referred to the undersigned Magistrate Judge for a memorandum and recommendation. (*See* Order (D.E. 571)). For the reasons set forth below, it will be recommended that Epics's motion for partial summary judgment be allowed in part and denied in part.

## BACKGROUND

### I. LICENSE AGREEMENT

SK and Epic are both engaged in the business of developing video games. In 2004, the parties entered into negotiations over a license agreement that would allow SK to use Epic's video game engine, the Unreal Engine 3 ("UE3"), in SK's development of a game. The UE3 included the Unreal Editor, a tool used for game development. Epic gave SK access to the UE3 in August of 2004 to enable it to evaluate the UE3. (Mutual Nondisclosure Agreement (D.E. 533-13)). SK contends that during the parties' negotiations, Epic falsely represented that it would be committed to its licensees, notwithstanding its own use of the UE3 for its *Gears of War* video game. SK also alleges that Epic falsely made a number of representations to it about the UE3's functionality. SK contends that in reliance on Epic's representations, it entered into a license agreement with Epic on 10 May 2005 ("License Agreement" (D.E. 532-6)).

The License Agreement provided that upon payment of the initial license fee of $750,000.00 SK would be permitted to use the UE3 "for the sole purpose of developing" an authorized game, identified in the License Agreement as "Game 1." (*Id.* §§ 1(g), 2(a)-(e); Denis Dyack Deposition (D.E. 532-16) 537:11-17 ). This game was eventually named *Too Human* and was to be developed for Microsoft's Xbox-2 game console. (Compl. (D.E. 1), *e.g.*, ¶ 55; *see also* Lic. Agree. § 5(a)).

---

[4] The declaration was filed at D.E. 568-1 and case law at D.E. 568-2.

The License Agreement also permitted SK "to develop Enhancements for use in the Game [*i.e.*, *Too Human*]." (Lic. Agree. § 2(a)). "Enhancements" is defined as "any technology developed by [SK] that enhances or improves the Licensed Technology [*i.e.*, UE3]." (*Id.* § 1(d)). SK retained an ownership interest in and to any Enhancements. (*Id.* § 6(a)).

The License Agreement contained a warranty from Epic that the UE3 would operate on Microsoft's and Sega's next generation video game consoles within six months of the release of the final development kits for those game platforms (*id.* § 5(a)(iv)), but provided that unless otherwise expressly provided, Epic was not providing any warranty that the UE3's functions would meet SK's requirements or would be completely error free (*id.* § 5(b)). Section 5(d) of the License Agreement provided that Epic disclaimed all other warranties and representations (express or implied, oral or written) with respect to the UE3 ("disclaimer provision"). (*Id.* § 5(d)). The disclaimer provision also provided: "LICENSEE [*i.e.*, SK] ACKNOWLEDGES THAT IT HAS RELIED ON NO WARRANTIES OTHER THAN THE EXPRESS WARRANTIES IN THIS AGREEMENT." (*Id.*).[5] Pursuant to Section 12(n), the parties agreed that the License Agreement represented the parties'

---

[5] The disclaimer provision reads in full:

Disclaimer Of All Other Warranties And Representations. EXCEPT AS EXPRESSLY SET FORTH ELSEWHERE IN THIS AGREEMENT, THE EXPRESS WARRANTIES AND EXPRESS REPRESENTATIONS SET FORTH IN THIS SECTION 5 ARE IN LIEU OF, AND EPIC DISCLAIMS, ANY AND ALL OTHER WARRANTIES, CONDITIONS, OR REPRESENTATIONS (EXPRESS OR IMPLIED, ORAL OR WRITTEN), WITH RESPECT TO THE UNREAL ENGINE OR ANY PART THEREOF OR THIRD PARTY SOFTWARE OR ANY PART THEREOF OR IN CONNECTION WITH TECHNICAL SUPPORT PROVIDED UNDER THIS AGREEMENT, INCLUDING ANY AND ALL IMPLIED WARRANTIES OR CONDITIONS OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY, OR FITNESS OR SUITABILITY FOR ANY PURPOSE (WHETHER OR NOT AWARE OF ANY SUCH PURPOSE), WHETHER ALLEGED TO ARISE BY LAW, BY REASON OF CUSTOM OR USAGE IN THE TRADE, OR BY COURSE OF DEALING. LICENSEE ACKNOWLEDGES THAT IT HAS RELIED ON NO WARRANTIES OTHER THAN THE EXPRESS WARRANTIES IN THIS AGREEMENT.

(Lic. Agree. § 5(d)).

3

entire understanding and was intended to supersede "all prior representations and agreements, whether oral or written, with respect to the same subject matter." (*Id.* § 12(n)).

In the License Agreement, SK agreed not to sell, disclose, distribute, or sublicense the Unreal Engine software program. (*Id.* §§ 1(j), 2(b)). In addition, SK acknowledged that it was forbidden to copy, modify, or distribute Epic's copyrighted works unless expressly authorized by the License Agreement. (*Id.* § 2(d)). SK further agreed that the UE3 technology "constitute[s] or contain[s] valuable trade secrets or proprietary and Confidential Information." (*Id.* § 6(b)). Epic has registered copyrights for the UE3 with the United States Copyright Office. (Countercl. ¶ 12).

## II.     SK'S PUBLISHING AGREEMENTS

In 2004, SK had discussions with Microsoft Corporation ("Microsoft") concerning a publishing agreement under which Microsoft would pay SK to develop *Too Human* in exchange for Microsoft's right to sell the game. (Denis Dyack Deposition (D.E. 532-15) 37:10-38:2). SK delivered a prototype of *Too Human* to Microsoft in November of 2004. The publishing agreement entered into in December 2004 required SK to deliver a final version of *Too Human* to Microsoft by 1 November 2006. (Microsoft Pub. Agree. (D.E. 533-17) Exhibit A). The publishing agreement with Microsoft was amended several times to extend the delivery date for *Too Human* to July of 2008. In addition, the 2 April 2008 amendment of the publishing agreement confirms that neither SK nor Microsoft is in breach of the publishing agreement "notwithstanding any document to the contract that may have emanated from either party at any point." (Microsoft Pub. Agree., Amendment No. 8, ¶ 2 at p. 55).

In 2005, SK also began producing a video game known as *The Box* (and later *The Ritualist*). SK entered into a publishing agreement with Sega of America ("Sega") in March of 2005 that

4

required SK to deliver a final version of *The Box* to Sega by 27 February 2007. (Sega Pub. Agree. (D.E. 534-9 and 534-10)). The publishing agreement with Sega was amended to extend the delivery date for *The Box* to 4 November 2008. (Sega Pub. Agree. (D.E. 534-10) at p. 26). In August of 2008, however, Sega and SK transferred the project to THQ, another publisher. (Jeremy Sherlock Dep. (D.E. 535-1) 249:3-23). SK contends that Epic was aware of its agreement with Sega and that Epic agreed that SK would not have to pay a license fee for this project until the project was approved by Sega for full production.

## III.   SK'S CLAIMS AND EPIC'S COUNTERCLAIMS

In July 2007, SK commenced this lawsuit against Epic alleging fraud, negligent misrepresentation, intentional interference with contractual relations, intentional interference with prospective economic advantage, breach of warranty, unfair and deceptive trade practices ("UDTPA"), common law unfair competition, unjust enrichment, contract rescission or reformation, common law breach of contract, and breach of contract under the North Carolina Uniform Commercial Code, N.C. Gen. Stat. §§25-2-101, *et seq.* (*See generally* Compl.). Specifically, SK claims that Epic failed to provide SK with properly working software or offer any reasonable support to SK as a licensee. (*Id.* ¶ 14). SK further alleges that Epic wrongfully used the licensing fees it obtained from SK and other licensees to fund the launch of *Gears of War* that competes with the games of the UE3 licensees and has enjoyed substantial commercial success at the expense of the UE3 licensees. (*See id.* ¶ 16). SK admits in its complaint that it abandoned the UE3 and began creating its own engine, the "Silicon Knights Engine" (also referred to as the "SK Real Engine") ("SKE"). (*Id.* ¶ 57). It also acknowledges that it used the UE3 code in the SKE. (*Id.* ¶ 59).

5

In August 2007, Epic filed a set of counterclaims (D.E. 8) against SK. In its counterclaims, Epic alleges that SK used Epic's licensed technology in violation of Epic's rights under the License Agreement. The alleged violations included SK's development of the SKE using code from the UE3. (*See* Countercl. (D.E. 8) 1-2 & ¶¶ 22, 29, 33.c, 40). Epic asserts claims against SK for copyright infringement, breach of the License Agreement, and misappropriation of trade secrets, and for the imposition of a constructive trust. (*See* Countercl.).

## DISCUSSION

By its motion, Epic seeks partial summary judgment on SK's claims for fraud (first cause of action), negligent misrepresentation (second cause of action), intentional interference with contractual relations and prospective economic advantage (third and fourth causes of action), UDTPA violations and common law unfair competition (sixth and seventh causes of action), unjust enrichment (eighth cause of action), and rescission or reformation (ninth cause of action). Epic argues that each of the claims fails to survive summary judgment on its own merits. It also contends that the tort claims—that is, all the referenced claims other than the rescission or reformation claim—are barred by North Carolina's economic loss rule. In addition, Epic seeks summary judgment on its own copyright infringement counterclaim (first counterclaim).

Epic does not move for summary judgment on SK's breach of contract claims, consisting of the breach of warranty claim (fifth cause of action), common law breach of contract claim (tenth cause of action), and breach of contract claim under the UCC (eleventh cause of action), or SK's claim for a declaratory judgment (twelfth cause of action). Epic essentially concedes that the "breach of contract claim" must be resolved at trial. (*See* Def.'s Mem. (D.E. 532) 8). Epic also does not seek summary judgment on its counterclaims for breach of contract (second counterclaim), trade secret

6

misappropriation (third counterclaim), or a constructive trust, based on the conduct alleged in the first and third counterclaims (fourth counterclaim). Thus, irrespective of the ruling on Epic's motion, this case is proceeding to trial.

The court's analysis begins with a review of the principles governing summary judgment and the economic loss rule. The court will then analyze, in turn, SK's tort claims, its rescission or reformation claim, and Epic's copyright infringement claim. In its discussion of each tort claim, the court will address the merits of the claim individually for summary judgment purposes and then, where appropriate, the viability of the claim under the economic loss rule.

## I. APPLICABLE LEGAL PRINCIPLES

### A. Standard of Review

It is well established that a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In analyzing whether there is a genuine issue of material fact, all facts and inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996).

The burden is on the moving party to establish the absence of genuine issues of material fact and "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323; *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991) ("[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary

7

judgment is appropriate."). If the movant meets its burden, then the non-moving party must provide the court with specific facts demonstrating a genuine issue for trial in order to survive summary judgment. *Celotex*, 477 U.S. at 323. The non-moving party is not permitted to rest on conclusory allegations or denials, and a "mere scintilla of evidence" will not be considered sufficient to defeat a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Rule 56(a) permits the court to grant summary judgment "with respect to all claims in an action or only some claims in a multiple claim action." *Evergreen Int'l, S.A. v. Marinex Const. Co., Inc.*, 477 F. Supp. 2d 697, 699 (D.S.C. 2007). A motion for partial summary judgment "utilizes the same standards required for consideration of a full motion for summary judgment." *Pettengill v. U.S.*, 867 F. Supp. 380, 381 (E.D. Va. 1994). However, a party is not entitled to partial summary judgment unless such judgment would be dispositive of an entire claim. *Evergreen*, 477 F. Supp. 2d at 699. The "piecemealing" of select elements on a single claim is not permitted by Rule 56. *Id.* Further, "partial summary judgment is properly withheld where, on the basis of the cold record, a considerable expenditure of judicial time and effort will be required 'to sift out and piece together the undisputed facts essential to a summary judgment.'" *Toyoshima Corp. of California v. Gen. Footwear, Inc.*, 88 F.R.D. 559, 560 (S.D.N.Y. 1980) (quoting *Perma Research & Dev. Co. v. Singer Co.*, 308 F. Supp. 743, 750 (S.D.N.Y. 1970)). "In a complex fact-intensive case . . . , a court has discretion to deny a partial summary judgment, even if such is justified, in order to proceed more efficiently and more expeditiously with a definitive resolution." *Ryste & Ricas, Inc. v. U.S.*, 50 Fed. Cl. 85, 90 (2001). "In assessing a summary judgment motion, a court is entitled to consider only the evidence that would be admissible at trial." *Kennedy v. Joy Tech., Inc.*, 269 Fed. Appx. 302, 308 (4th Cir. 2008).

8

**B.    Economic Loss Rule**

North Carolina[6] has an economic loss rule that limits a contracting party's ability to recover in tort. The rule provides that, in general, a breach of contract claim will not support the assertion of tort claims as well. *Schumacher Immobilien Und Beteiligungs AG v. Prova, Inc.*, No. 1:09CV18, 2010 WL 2867603, at *8 (M.D.N.C. 21 Jul. 2010) ("It is well settled under North Carolina law that a mere breach of contract cannot sustain claims sounding in tort."), *M&R adopted*, 2010 WL 3943754 (M.D.N.C. 7 Oct. 2010); *Kelly v. Georgia-Pacific LLC*, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009); *North Carolina State Ports Auth. v. Lloyd A. Fry Roofing Co*, 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978) ("Ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor."), *rejected in part on other grounds by Trustees of Rowan Tech. V. Hammond Assoc.*, 313 N.C. 230, 242, 328 S.E.2d 274, 281 (1985). The reasoning behind the rule is that parties to a contract do not owe each other special duties beyond those designated in the contract:

> Simply stated, [North Carolina's] economic loss rule prohibits recovery for purely economic loss in tort, as such claims are instead governed by contract law. . . . As previously stated by th[e North Carolina] Court [of Appeals], '[t]he rationale for the economic loss rule is that the sale of goods is accomplished by contract and the parties are free to include, or exclude, provisions as to the parties' respective rights and remedies, should the product prove to be defective.' Thus, the rule encourages contracting parties to allocate risks for economic loss themselves, because the promisee has the best opportunity to bargain for coverage of that risk or of faulty workmanship by the promisor.

*Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 639, 643 S.E.2d 28, 30 (2007) (citations omitted). In short, "North Carolina courts have developed (and the Fourth Circuit has

---

[6] The License Agreement provides, and the parties do not dispute, that the applicable state law is that of North Carolina.  (Lic. Agree. § 12(f)).

applied) the economic loss rule, which prohibits recovery for purely economic loss in tort when a contract, a warranty, or the UCC operates to allocate risk." *Kelly*, 671 F. Supp. 2d at 791. The economic loss rule applies even where the breach of contract was the result of negligence. *Kelly*, 671 F. Supp. 2d at 792 (citing *N.C. St. Ports Auth.*, 294 N.C. at 83, 240 S.E.2d at 351)).

Under the rule, in order to assert a tort and breach of contract claim arising from the same conduct, a plaintiff must allege a duty owed by the defendant that is separate and distinct from duties owed pursuant to the contract. *Vanwyk Textile Sys., B.V. v. Zimmer Mach. Am., Inc.*, 994 F. Supp. 350, 362 (W.D.N.C. 1997). Not only must the tort constitute an identifiable, "independent tort," *see Strum v. Exxon Co., U.S.A.*, 15 F.3d 327, 330 (4th Cir. 1994), but the "tort also must have an aggravating element, such as fraud, malice, reckless indifference, oppression, insult, and willfulness." *Schumacher Immobilien Und Beteiligungs AG v. Prova, Inc.*, No. 1:09CV18, 2010 WL 3943754, at *2 (M.D.N.C. 7 Oct. 2010) (internal quotations omitted). "The policy behind the 'independent tort' exception is to keep open-ended tort damages from distorting contractual relations in light of the fundamental difference between tort and contract claims." *ACS Partners, LLC v. Americon Group, Inc.*, No. 3:09cv464-RJC-DSC, 2010 WL 883663, at *7 (W.D.N.C. 5 Mar. 2010) (citing *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir.1998)). "Courts only allow tort causes of action if contract theory is insufficient to cover the facts." *ACS Partners*, 2010 WL 883663, at *8; *HPS Techs., Inc. v. E.I. Dupont De Nemours and Co.*, No. 1:06CV1-61, 2009 WL 3434280, at *10 (M.D.N.C. 20 Oct. 2009) (recommending dismissal of tort claims under the economic loss doctrine where tort claims were not "distinct from" the primary breach of contract action). Thus, while the economic loss doctrine will preclude general negligence claims directly arising from a contract, courts have not uniformly extended it to apply to fraud or

negligent misrepresentation claims as well. *Club Car, Inc. v. Dow Chemical Co.*, No. 06CVS15530, 2007 WL 2570088, at *4 (N.C. Super. 3 May 2007) ("The North Carolina appellate courts have yet to extend the application of the economic loss doctrine to bar claims based on fraud.") (citing *Coker v. DaimlerChrysler Corp.*, 172 N.C. App. 386, 405, 617 S.E.2d 306, 318 (2005)); *Wilson v. Dryvit Sys., Inc.*, 206 F. Supp. 2d 749, 754-55 (E.D.N.C. 2002), *aff'd,* 71 Fed. Appx. 960 (4th Cir. 2003) (holding that economic loss rule did not extend to claims for negligent misrepresentation); *cf. Broussard*, 155 F.3d at 345-46 (applying economic loss rule to claims for fraud and negligent misrepresentation); *Gregory Wood Prods., Inc. v. Advanced Sawmill Machinery Equip., Inc.*, No. 5:06CV87, 2007 WL 1825179, at *9 (W.D.N.C. 25 Jun. 2007) (applying economic loss rule to bar negligent misrepresentations made in connection with contract formation).

There are four non-exclusive scenarios in which application of the economic loss rule is precluded.[7] *See North Carolina Ports Auth.*, 294 N.C. at 82-83, 240 S.E.2d at 351. This case does not present any of those situations.

---

[7] "The four scenarios are: (1) The injury, proximately caused by the promisor's negligent act or omission in the performance of his contract, was an injury to the person or property of someone other than the promisee. . . . (2) The injury, proximately caused by the promisor's negligent, or wilful, act or omission in the performance of his contract, was to property of the promisee other than the property which was the subject of the contract, or was a personal injury to the promisee. . . . (3) The injury, proximately caused by the promisor's negligent, or wilful, act or omission in the performance of his contract, was loss of or damage to the promisee's property, which was the subject of the contract, the promisor being charged by law, as a matter of public policy, with the duty to use care in the safeguarding of the property from harm, as in the case of a common carrier, an innkeeper or other bailee. . . . (4) The injury so caused was a wilful injury to or a conversion of the property of the promisee, which was the subject of the contract, by the promisor. . . ." *Kelly*, 671 F. Supp. 2d at 792 n.2 (quoting *North Carolina State Ports Auth.*, 294 N.C. at 82, 240 S.E.2d at 350-51).

11

## II. SK'S TORT CLAIMS

### A. Fraud

#### 1. Overview of Claim

As indicated, Epic seeks summary judgment on SK's fraud claim. The gravamen of SK's fraud claim is that Epic fraudulently induced it to enter into the License Agreement through a series of at least 41 misrepresentations and 11 omissions.[8]

Under North Carolina law, a party can establish a claim for fraud by showing a (1) false representation or concealment of a past or existing material fact, (2) reasonably calculated to deceive, (3) made with the intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the other party. *Suntrust Bank v. Dowdy*, No. 5:08CV458, 2010 WL 3834573, at *5 (E.D.N.C. 30 Sept. 2010). Thus, the plaintiff must show that the defendant made the false representation with intention that it should be acted upon by the plaintiff, and that the representation was reasonably relied upon by the plaintiff. *Metro. Group, Inc. v. Meridan Indus., Inc.*, No. 3:09CV440, 2010 WL 5056771, at * 2 (W.D.N.C. 6 Dec. 2010).

For an omission to be actionable fraud, the plaintiff must also show that the defendant knew of the material matter not disclosed and had a legal duty to communicate it to plaintiff. *Breedon v. Richmond Comm. Coll.*, 171 F.R.D. 189, 194, 196 (M.D.N.C. 1997). The duty may arise from a relation of trust, from confidence, inequality of condition or knowledge, or other attendant

---

[8] An interrogatory answer by SK sets forth a numbered list of 41 of the alleged misrepresentations. (*See* SK's Ans. to Interr. 13 (D.E. 535-14) at pp. 2-11). The parties refer to each of these misrepresentations in their briefs by the prefix "AM" for "alleged misrepresentation" followed by the number assigned to the misrepresentation in the list. (*See* SK's Mem. 13 n.94). The court follows this protocol as well. The list purportedly includes alleged misrepresentations set forth in Paragraphs 8, 15, 17, 49, 50, 60, 61, and 88 of SK's complaint. (*See* SK's Ans. to Interr. 13 at p. 2). In its interrogatory answer, SK also identifies 11 alleged omissions or concealments by Epic as part of its purported fraud. (*Id.* 12-13). The omissions are not numbered separately.

12

circumstances. *Id.* at 194 n.4, 196. Such circumstances may include situations in which the parties are dealing at arm's length and one party has taken affirmative steps to conceal material facts from the other, one party has knowledge of a latent defect in the subject matter of the dealings about which the other party is both ignorant and unable to discover through reasonable diligence, and a party makes a partial disclosure that compels full and fair disclosure to the other party. *Id.* 196. "Under North Carolina law, a party to a contract owes the other contracting party a separate and distinct duty not to provide false information to induce the execution of the contract." *Schumacher Immobilien*, 2010 WL 3943754, at *2 (citing *Kindred of N.C., Inc. v. Bond*, 160 N.C. App. 90, 101, 584 S.E.2d 846, 853 (2003)).

As indicated, fraud generally requires that the misrepresentations or omissions relate to facts and not opinions, sales talk, or promissory statements. *Wilson v. Popp Yarn Corp.*, 680 F. Supp. 208, 215 (W.D.N.C. 1988) (statements of opinion or puffery are generally not actionable as fraud); *American Laundry Mach. Co. v. Skinner*, 225 N.C. 285, 290, 34 S.E.2d 190, 194 (1945) (noting general rule that promissory representations cannot constitute actionable fraud); *Hudgins v. Wagoner*, __ N.C. App. __, 694 S.E.2d 436, 445 (2010) ("As a general rule, a mere promissory representation will not be sufficient to support an action for fraud.") (quoting *Johnson v. Phoenix Mut. Life Ins. Co.*, 300 N.C. 247, 255, 266 S.E.2d 610, 616 (1980)); *Leftwich v. Gaines*, 134 N.C. App. 502, 508-09, 521 S.E.2d 717 (1999) (noting that for purposes of fraud claims, promissory representations and opinions are treated similarly). But a purported opinion or promissory representation may support a fraud claim if, at the time the statement is made, the speaker actually believes to the contrary and makes the statement with an intent to deceive the other party. *Leftwich*, 134 N.C. App. at 508-09, 521 S.E.2d at 723; *see also Vantage Mktg., Inc. v. De Amertek Corp., Inc.*,

13

31 Fed. Appx. 109, 113-14 (4th Cir. 2002) (holding that a "promissory misrepresentation may constitute actionable fraud when it is made with intent to deceive the promisee, and the promisor, at the time of making it, has no intent to comply") (quoting *Leftwich*, 134 N.C. App. at 521).

The determination whether a particular statement is one of fact or opinion and whether the statement was made with an intent to deceive is normally left to the jury. *Int'l Designer Transitions, Inc. v. Faus Group, Inc.*, 663 F. Supp. 2d 432, 442 n.8 (M.D.N.C. 2009) (denying summary judgment on fraud claim where issues of fact existed over whether purportedly actionable statements were opinion or fact); *Olympus Managed Health Care, Inc. v. Am. Housecall Physicians, Inc.*, 662 F. Supp. 2d 427, 438 (W.D.N.C. 2009) (noting that a person's state of mind is generally an issue of fact); *Ragsdale v. Kennedy*, 286 N.C. 130, 138-39, 209 S.E.2d 494, 500-501 (1974) (denying summary judgment where president of a corporation who knew the business had lost money, yet made positive representations it was a " gold mine" and a "going concern," finding a jury question as to whether such representations were intended and received as statements of opinion or of material fact).[9]

In determining Epic's motion, the court has reviewed all the alleged misrepresentations and omissions by SK and will give examples of various types of alleged misrepresentations and omissions in its analysis. At the same time, the court believes it inappropriate on a motion for partial summary judgment to parse through the alleged misrepresentations and omissions and categorize the status of each. *See Collins v. Cottrell Contracting Corp.*, __ F. Supp. 2d. __, No. 7:08-CV-96-FL,

---

[9] While federal law controls on the procedural standards for summary judgment, decisions by the North Carolina courts on the suitability of summary judgment with respect to claims grounded on North Carolina law are instructive not only because of the similarity between the federal and North Carolina standards for summary judgment (which is grounded in the similarity of Federal Civil Rule 56 and North Carolina Civil Rule 56), but also because the state summary judgment rulings shed light on the substantive state law legal principles at issue. Both parties rely on such North Carolina court decisions throughout their respective briefs.

2010 WL 3075507, at *6 (E.D.N.C. 5 Aug. 2010) (noting that "a number of courts have concluded that a motion for summary judgment may not properly seek to dispose of only a factual allegation or element of a single indivisible claim for relief"). After all, the issue presently before the court is the viability of SK's fraud claim, not the admissibility at trial of evidence of individual representations and omissions, a matter left for the trial judge.

Epic contends that SK has failed as a matter of law to establish numerous elements of its fraud claim.[10] The court turns now to an analysis of the principal contentions advanced by Epic.

### 2. Nature of Alleged Misrepresentations and Omissions

Epic argues that many of the alleged misrepresentations are not in the nature of statements of fact, but instead merely recommendations, puffing, or predictions. As such, Epic argues, they cannot form the basis of a fraud claim. Epic dismisses the omissions as mere counterparts to the representations.[11]

The statements and omissions upon which SK relies arguably may contain some non-actionable general opinions or promises. These include the representations that the UE3 would have a high degree of functionality (AM 1(1)) and that Epic would fully support the licensees of the UE3 (AM34)). But other more specific representations go to the heart of SK's allegations that Epic knew at the time the contract was entered into that the UE3 could not support the functions promised and that it never intended to treat all licensees and its own projects equally. These include

---

[10] In addition to challenging specific elements of fraud claim, Epic denies that certain misrepresentations were ever made. That challenge, of course, presents genuine issues of material fact and, in any event, as indicated, applies to solely a handful of the alleged misrepresentations.

[11] The court finds that the nature of the omissions as such does not preclude SK from pursuing its claims based on them. More specifically, the court finds that there are at least genuine issues of material fact as to whether Epic had a duty under the authorities previously cited to speak and not to keep silent with respect to the subject matter of the alleged omissions.

representations that Epic would split its workforce into an Epic games and the UE3 team (AM 1(3)), that the UE3 could display certain numbers of characters on the screen (*e.g.*, AM 7-9), that Epic's *Gears of War* development team would be treated like a licensee (AM 36), and that Epic would make minimal use of Epic-only game-side code (AM 41)). While representations such as these or corresponding omissions do appear to be in the nature of opinions or promises, the court cannot say that they are non-actionable as a matter of law by virtue of their nature. Rather, they present a question for the jury that will depend on the intent behind them, which is discussed further below.

Accordingly, at this stage of the proceedings, the court is unable to conclude as a matter of law that the nature of the alleged representations and omissions made by Epic is fatal to SK's fraud claim. To the extent that Epic's motion seeks summary judgment on SK's fraud claim on that ground, it should be denied.

### 3. Truthfulness of Representations and Omissions

Epic denies that any of the alleged statements of fact were false when made. It argues that the failure of any promises to be realized cannot form the basis of a fraud claim.

The court finds that there exist genuine issues of material fact with respect to the accuracy of representations and omissions relating to fact. SK has also created genuine issues of material fact with respect to the validity of representations and omissions in the nature of opinions or promises. In other words, the court cannot say that the opinions and promises were so clearly valid that they could not have resulted in SK being deceived. Genuine issues are created on these questions by, among other evidence, the substantial evidence of record that the UE3 did not perform as Epic allegedly represented it would, some of which is reviewed in the next section. Accordingly, to the

16

extent that Epic's motion seeks summary judgment on the fraud claim on the ground that its alleged misrepresentations and omissions are indisputably accurate and valid, the motion should be denied.

### 4. Intent behind the Representations and Omissions

Epic contends that SK has failed to create any genuine issues of material fact with respect to the intent element of its fraud claim. Epic claims, in particular, that the record lacks proof showing that Epic personnel knew any alleged statements to be less than truthful at the time they were made and argues that, if anything, the record reflects that the statements were the speakers' honest beliefs and expectations at the time. (*See* Decl. of Tim Sweeney (D.E. 537-2) ¶¶ 3-16; Decl. of Mark Rein (D.E. 537-3) ¶¶ 3-8; Decl. of Joseph Graf (D.E. 537-4) ¶¶ 4-8; Decl. of Michael Capps (D.E. 537-5) ¶¶ 3-5)).

The court finds, however, that with respect to all the alleged misrepresentations and omissions there are issues of fact regarding the intent of the speaker. As indicated, in order to establish the requisite scienter for a fraud claim, a party must establish that the person making the alleged misrepresentations or omission knew it to be untruthful in nature and affirmatively intended to deceive the other party. *See Suntrust Bank*, 2010 WL 3834573, at *5. In the case of an opinion or promise, the speaker must actually believe to the contrary and make the statement with the intent to deceive the other party. *See Leftwich*, 134 N.C. App. at 508-09, 521 S.E.2d at 723. Summary judgment is generally inappropriate to resolve such issues of fraudulent intent. *See Parker v. Bennett*, 32 N.C. App. 46, 54, 231 S.E.2d 10, 15 (1977) (holding that in actions for fraud "where motives, intent, subjective feelings and reactions, consciousness and conscience, are to be searched, the issues may not be disposed of on summary judgment"). That is certainly the case here.

17

SK has adduced sufficient evidence from which a jury could reasonably infer that the various speakers had the intent to deceive when they made their respective representations and omissions. For example, evidence regarding the basic nature of the parties's businesses and the relationship between them establishes that Epic had a possible motive to deceive SK into entering into the License Agreement in order to fund the development costs of its own games and delay the work of SK and other competing licensees on their video games. There is also Epic's admission in its counterclaim (Countercl. ¶ 7) that it developed the UE3 in conjunction with the development of its own game as part of its "synergistic model" and not separately as it had led SK to believe.

Epic's witnesses confirmed that at the time the License Agreement was in place, it never had any employees dedicated solely to servicing licensees and that, instead, every programmer on the engine team also had licensee support as a job function. (Timothy Sweeney Dep. (D.E. 561-12) 49:16-51:12). This is, of course, in contrast to the alleged representations by Epic that its programmers would be divided between those dedicated to engine development and support, and those dedicated to development of Epic's own games. Indeed, SK cites to internal emails from Epic's officers instructing programmers that "Gears [of War] comes first, so if you have any Gears tasks, drop work in the main branch and finish Gears tasks" (Email communication from Daniel Vogel (D.E. 559-8)) and that "Right now, we are very much in 'will this help Gears ship faster? If not, punt' mode" (Email communication from Michael Capps (D.E. 560-7)).

SK has also come forward with evidence that some licensees were treated more favorably than others in, for example, the release of the UE3 code. (Michael Capps Dep. (D.E. 536-1) 205:14-24). In addition, SK has demonstrated that other licensees expressed many of the very same

18

frustrations that SK did about representations made by Epic that were unfulfilled and perceived to be misleading. (*See* 7 June 2006 Letter from Buena Vista Games (D.E. 559-12)).

The fact that Epic provided SK a copy of UE3 to evaluate prior to entry into the License Agreement and offered to have SK pay through back-end royalties rather than an up-front license fee, as was ultimately agreed upon, does not negate fraudulent intent as a matter of law, as Epic argues. Taking the evidence in the light most favorable to SK, as required on summary judgment, Epic's providing SK the trial copy of the UE3 could be seen as an effort by Epic to promote SK's confidence in Epic and thereby its entry into the License Agreement, with Epic addressing through its alleged misrepresentations and omissions concerns of SK arising from the trial use of the UE3. Similarly, Epic's flexibility on payment is arguably consistent with SK's theory that a primary objective of Epic was, not simply to maximize remuneration on its license agreements for UE3, but to tie up SK and other competing licensees with a deficient game engine.

It is no defect that the evidence of fraudulent intent upon which SK relies is circumstantial. "[F]raudulent intent . . . is usually proven by circumstantial evidence." *Sunset Beach Devel., LLC v. AMEC, Inc.*, 196 N.C. App. 202, 208-09, 675 S.E.2d 46, 52 (2009) (citing *Parker v. Bennett*, 32 N.C. App. 46, 54, 231 S.E.2d 10, 15 (1977)). Thus, the fact that Epic has adduced evidence that the various speakers believed the statements they made to be true does not resolve the issue of their intent for summary judgment purposes, but simply creates an issue of fraudulent intent for the jury. Therefore, on the issue of fraudulent intent, Epic's motion fails.

### 5. Fact of Reliance and Its Reasonableness

Finally, Epic contends that SK cannot show that it relied at all on the alleged misrepresentations and omissions in entering into the License Agreement or, if it did rely, such

19

reliance was not reasonable. Among the grounds Epic advances in support of this contention are that many of the alleged statements post-date SK's decision to use the UE3; SK's reasons to use the UE3, particularly its interest in Unreal Editor, were unrelated to the alleged misrepresentations made; SK had doubts about Epic's alleged representations; SK was contractually mandated by the publishing agreement it had with Microsoft to use the UE3 irrespective of any alleged misrepresentations or omissions by Epic; and the disclaimer provision in the License Agreement precluded SK's reliance on any parol representations Epic made.

The fact and reasonableness of a plaintiff's reliance on the alleged misrepresentations and omissions of a defendant are generally issues for the jury. *Hudgins*, 694 S.E.2d at 445 ("'The reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion.'") (quoting *State Properties, LLC v. Ray*, 155 N.C. App. 65, 73, 574 S.E.2d 180, 186 (2002)). The facts of record here do not support only the conclusion that SK did not rely on the alleged misrepresentations and omissions or that any reliance by SK was unreasonable, as Epic contends.

As to the fact of reliance, SK has submitted evidence that it did, in fact, rely on representations by Epic in deciding to enter into the License Agreement. Such evidence includes declarations by SK's management personnel. (Decl. of James O'Reilly (D.E. 559-2) ¶¶ 8-9, 12; Decl. of Denis Dyack (D.E. 559-3) ¶¶ 13-14, 17).

It is true, as Epic argues, that some of the alleged representations and omissions post-date SK's decision to use the UE3, whether that decision is deemed to have been made in August of 2004, as Epic argues, or May of 2005, when the License Agreement was signed, as SK argues. (*See, e.g.*,

20

AM 2, AM 11, AM 41). But many do not post-date SK's decision. (*See, e.g.*, AM 5, AM 18, AM 19, AM 39).

Similarly, some of SK's reasons to use the UE3 do appear to be unrelated to certain representations and omissions made. For example, SK concedes that one reason it entered into negotiations with Epic was to obtain access to the Unreal Editor program, which was included in the UE3 but was not the subject of the alleged misrepresentations and omissions. (*See* SK's Mem. 26). But other reasons for SK's decision to enter into the License Agreement do relate to representations and omissions made. For instance, SK indicates that the UE3's promised functionality and Epic's professed commitment to its licensees were factors that weighed in its decision. (Dyack Decl. ¶¶ 13-14).

Nor does evidence that SK was skeptical of Epic's ability to perform as promised show a lack of reliance, even at the time representations and omissions were made. The record does not establish that the skepticism reached such a high level as to prelude SK's reliance as a matter of law. *See Willen v. Hewson*, 174 N.C. App. 714, 719, 622 S.E.2d 187, 191 (2005) (finding that even where plaintiff's reliance is unreasonable, "in close cases, [defendants] [who] intentionally and falsely represent [ ] material facts so as to induce a party to action 'should not be permitted to say in effect, 'You ought not to have trusted me. If you had not been so gullible, ignorant, or negligent, I could not have deceived you.'") (quoting *Johnson v. Owens*, 263 N.C. 754, 758, 140 S.E.2d 311, 314 (1965)). In particular, SK's experience with the UE3 during the trial period was not so extreme as to itself negate the possibility of reasonable reliance by SK, particularly since, as discussed, the trial use of the UE3, along with Epic's flexibility on fee arrangements, could plausibly be seen as part of the scheme to defraud SK.

21

As to SK's publishing agreement with Microsoft, it did identify the UE3 as third-party material SK could use. (*See* Microsoft Pub. Agreement, Exhibit E "Third party Materials"). But there is evidence that it did not obligate SK to do so. (Dyack Dep. (D.E. 532-15) 39:14-41:6). Thus, SK's obligations to Microsoft did not preclude it from selecting the UE3 of its own volition and relying on the alleged misrepresentations and omissions Epic made to it.

Finally, the court disagrees with Epic that the disclaimer provision in the License Agreement precluded SK from reasonably relying on Epic's alleged misrepresentations and omissions. One reason is that there is a genuine issue of material fact as to whether some of the alleged misrepresentations and omissions fall outside the scope of the disclaimer. As noted, the disclaimer by Epic extends to "any and all other warranties, conditions, or representations [besides those set forth in Section 5] . . . with respect to the Unreal Engine or any part thereof or third party software or any part thereof or in connection with technical support provided under this agreement." (Lic. Agree. § 5(d) (capitalization omitted)). Misrepresentations that may fall outside the scope of the disclaimer include those that the team developing Epic's own game (*i.e., Gears of War*) would operate effectively as a separate company from the team dedicated to the creation and support of the UE3 and that the *Gears of War* development team would be treated like a licensee in receiving support for and directing development of UE3. (*See* AM 28, 36, 37).

More fundamentally, though, the weight of authority holds that disclaimers should not be given preclusive effect where there is a triable issue that entry into the agreement containing the disclaimer was induced by fraud or negligent misrepresentation by the party invoking the disclaimer, as here. *See Republic Indus., Inc. v. Atlantic Veneer Corp.,* 166 F.3d 1210 (Table), 1999 WL 7859, at * 1 (4th Cir. 11 Jan. 1999) (holding that "barring fraud" court would enforce disclaimer provisions

in contract); *see also Atlantic Credit & Fin. Special Fin. Unit, LLC v. MBNA America Bank, N.A.*, No. 700CV00846, 2001 WL 856704, at *1 (W.D. Va. 4 Jun. 2001)("'[A] buyer can recover for fraudulent inducement not only where the contract contains a general disclaimer of warranties and liabilities, but also where the contract contains specific disclaimers that do not cover the allegedly fraudulent contract-inducing representations.'") (quoting *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 630-31 (4th Cir. 1999) (applying Virginia law); *Int'l Designer Transitions*, 663 F. Supp. 2d at 449 n.13 (rejecting argument that merger clause in contract prevented plaintiff from asserting tort claims); *Consol. Insured Benefits, Inc. v. Conseco Medical Ins. Co.*, No. 6:03-cv-03211-RBH, 2006 WL 3423891, at *12 (D.S.C. 27 Nov. 2006) (applying South Carolina law in holding that "[e]ven specific provisions or stipulations in a contract providing in effect for immunity from or nullification or waiver of preliminary or extraneous misrepresentations in connection with the contract are generally ineffective, and do not prevent a subsequent assertion of the misrepresentations as a basis for fraud," as well as noting that a "party should not be given the opportunity to free himself from an allegation of fraud by incorporating a generalized non-reliance clause into a contract") (internal citations and quotations omitted); *Governors Club, Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 251, 567 S.E.2d 781, 788-89 (2002) (allowing fraud claim to proceed notwithstanding disclaimer of warranties provision); *Zinn v. Walker*, 87 N.C. App. 325, 333, 361 S.E. 2d 314, 318 (1987) (holding that merger clauses, while generally upheld, will not bar claims where fraud, bad faith, or negligent omissions are established).

The court concludes that there are genuine issues of material fact on the question of whether SK reasonably relied on Epic's alleged misrepresentations and omissions. For this and the other

23

reasons discussed, the portion of Epic's motion seeking summary judgment on SK's fraud claim based on its individual merits should be denied.

### 6. Applicability of Economic Loss Rule

Similarly, the court finds that SK has made an adequate showing that its fraud claim constitutes an independent tort such that it is not barred by the economic loss rule. Specifically, SK relies on alleged misrepresentations and omissions that, according to Epic itself, are not coterminous with the commitments made in the License Agreement. That is, Epic contends that it never committed itself in the License Agreement to the matters that are the subject of the alleged misrepresentations and omissions, relying on the disclaimer provision and other provisions of the License Agreement. Thus, even if Epic complied with the License Agreement, SK could still conceivably have suffered damages from a failure by Epic to live up to the purportedly fraudulent promises and other misrepresentations and omissions it made. Accordingly, the alleged damages SK suffered as a result of Epic's purported fraud do not all directly flow solely from Epic's alleged breach of the License Agreement, but are separate and independent from the breach. *See Oestreicher v. Am. Nat. Stores, Inc.*, 290 N.C. 118, 136, 225 S.E.2d 797, 809 (1976) (permitting plaintiff to assert fraud claims which incorporated the allegations in breach of contract claims where defendant's intentional misstatements had tort overtones that caused plaintiff economic injury); *Vigus v. Milton A. Latta & Sons Dairy Farms, Inc.*, 197 N.C. App. 233, 676 S.E.2d 669 (Table), 2009 WL 1383342, at *5 n.3 (2009) (finding that economic loss doctrine did not preclude fraud and negligent misrepresentation claims made in connection with contract formation because "the fraud and negligent misrepresentations alleged by plaintiffs [fell] outside the scope of the contracts involved").

24

More generally, SK alleges and has presented circumstantial evidence of a scheme in which inducing SK to enter into the License Agreement is simply a means to the tortious end of unlawfully hurting a competitor. In this sense, the alleged breach of the License Agreement comprises only part of a broader pattern of tortious activity and does not itself account for all the alleged actionable misconduct by Epic.

For this and the other reasons discussed, SK's fraud claim presents genuine issues of material fact that preclude summary judgment. Epic's motion for summary judgment should therefore be denied in its entirety with respect to SK's fraud claim.

## B. Negligent Misrepresentation

As indicated, Epic seeks summary judgment on SK's claim for negligent misrepresentation. To state a claim for negligent misrepresentation under North Carolina law, a party must show that it (1) justifiably relied (2) to its detriment (3) on information prepared without reasonable care (4) by one who owed the relying party a duty of care. *Angell v. Kelly*, 336 F. Supp. 2d 540, 549 (M.D.N.C. 2004) (citing *Jordan v. Earthgrains Cos.*, 155 N.C. App. 762, 766, 576 S.E.2d 336, 339 (2003)); *Bob Timberlake Collection, Inc. v. Edwards,* 176 N.C. App. 33, 40, 626 S.E.2d 315, 322 (2006) ("Our Supreme Court has held that the tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care.") (citations omitted). The North Carolina Supreme Court has noted that summary judgment is "seldom appropriate" in cases alleging negligent misrepresentation "unless the evidence is free of material conflict, and the only reasonable inference that can be drawn therefrom is that there was no negligence on the part of defendant, or that his negligence was not the proximate cause of the injury." *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214,

25

220, 513 S.E.2d 320, 325 (1999) (quoting *Alva v. Cloninger*, 51 N.C. App. 602, 609, 277 S.E.2d 535, 539-40 (1981)).

As can be seen, the elements of fraud and negligent misrepresentation are similar under North Carolina law. A principal difference is that a claim for negligent misrepresentation does not require the intent to deceive, but may rest on the failure to use reasonable care in making representations or omissions. *See Breeden v. Richmond Cmty. College,* 171 F.R.D. 189, 202 n.14 (M.D.N.C. 1997) ("The tort of negligent misrepresentation in North Carolina is primarily a fraud-based claim.").

Here, SK relies on the same alleged misrepresentations and omissions in support of its negligent misrepresentation claim that it does for its fraud claim. Accordingly, for the same reasons that the court concludes that SK's fraud claim should survive summary judgment, SK's negligent misrepresentation claim should survive as well. More specifically, the same circumstantial evidence of record that creates genuine issues of material fact as to whether Epic perpetrated the alleged fraud against SK also creates genuine issues of material fact as to whether engaged in the alleged negligent misrepresentation. Similarly, the court finds that SK's negligent misrepresentation claim is not barred by the economic loss rule for the same reasons the fraud claim is not. It will therefore be recommended that Epic's motion for summary judgment be denied as to SK's claim for negligent misrepresentation.

### C. Intentional Interference

#### 1. Overview of Claims

Epic, of course, also seeks summary judgment on SK's claims for intentional interference with contract and prospective economic advantage. A party asserting a claim for interference with contract must establish five elements: (1) a valid contract exists between the plaintiff and a third

26

party that confers plaintiff with a contractual right against a third person; (2) the defendant is aware of the contract; (3) the defendant intentionally induced the third party not to perform the contract; (4) the defendant does so without justification; and (5) actual injury to plaintiff results. *ACS Partners*, 2010 WL 883663, at *8 n.4 (citing *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 370 S.E.2d 375 (1988)). Similarly, a claim for interference with prospective economic advantage requires a plaintiff to show that the defendant intentionally induced a third party to refrain from entering into a contract with plaintiff without justification and that the contract would have ensued but for the defendant's interference. *See RCDI Const., Inc. v. Spaceplan/Architecture, Planning & Interiors, P.A.*, 148 F. Supp. 2d 607, 617 (W.D.N.C. 2001); *see also Phifer v. City of Rocky Mount*, No. 5:08-CV-292-FL, 2010 WL 3860411, at *10 (E.D.N.C. 28 Sept. 2010) ("'[I]t is generally held that to interfere with a man's business, trade or occupation by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, is actionable if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights, but with a malicious design to injure the third person or gain some advantage at his expense.'") (quoting *Spartan Equip. Co. v. Air Placement Equip. Co.*, 263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965)).

SK bases its intentional interference claims on alleged interference by Epic with SK's publishing contracts with Microsoft and Sega. Specifically, SK contends that Epic tortiously interfered with both contracts by failing to meet its obligations under the License Agreement and thereby forcing SK to repeatedly renegotiate the terms of its publishing agreements on terms less favorable to it. SK also contends that Epic committed tortious interference with prospective economic advantage by inducing Microsoft not to publish any sequels to *Too Human* through its

27

breaches of the License Agreement. The claims with respect to each agreement are discussed in turn below.

## 2. Microsoft Publishing Agreement

The court finds that with respect to the Microsoft agreement SK has failed to present sufficient evidence to support its tortious interference with contract claim. As Epic contends, SK has not presented evidence that Microsoft failed to perform under the agreement, that Epic induced any such non-performance, or that Epic intended to induce Microsoft not to perform. Similarly, again as Epic contends, SK's claim for tortious interference with prospective advantage fails because SK has not presented evidence that Epic induced Microsoft not to publish any *Too Human* sequels, that Epic intended to induce Microsoft to make that decision, or that but for Epic's conduct Microsoft would have agreed to publish a sequel. The evidence supporting SK's allegation that Epic sought to harm SK's competitive standing in the market is no substitute for evidence of Epic's intent to induce Microsoft in particular not to meet its existing obligations to SK or to enter into further agreements with SK. *See Team 7, LLC v. Protective Solutions, Inc.*, __ F. Supp. 2d __, No. 5:08-CV-597-BO, 2010 WL 5351184, at *6 (E.D.N.C. 10 Dec. 2010) (allowing summary judgment motion where record failed to establish that defendant intentionally induced the third party "to do anything, much less to breach the [contract]"); *Bassett Seamless Guttering, Inc. v. GutterGuard*, 501 F. Supp. 2d 738, 744 (M.D.N.C. 2007) ("Generally to survive summary judgment, a plaintiff must offer evidence that a defendant directly interfered with a prospective contract between the plaintiff and an identifiable third party."). To the extent that Epic's conduct had negative effects on SK's relationship with Microsoft, such harm is most appropriately seen as a consequence of Epic's alleged

28

fraud, misrepresentation, and breach of the License Agreement and not as the basis for a separate cause of action for intentional interference.

SK has therefore failed to raise triable issues of fact with respect to each element of its interference claims relating to the Microsoft agreement. For the same reasons, it has not shown that this portion of its interference claims constitutes a separate tort claim immune from the economic loss rule. Epic's motion with respect to SK's interference claims regarding the Microsoft agreement should therefore be allowed.

### 3. Sega Publishing Agreement

The court finds that SK's interference with contract claim with respect to the Sega agreement fails for the same reasons that the claim fails with respect to the Mircosoft agreement. Again as Epic contends, SK has not presented any evidence that Sega did not perform under the agreement, that Epic induced any such non-performance, or that Epic intended to induce Sega not to perform. Indeed, a witness for Sega denied any such interference by Epic. (Jeremy Sherlock Dep. (D.E. 535-1) 250:4-11).[12] SK's claim for tortious interference with prospective advantage fails with respect to Sega because it has presented no evidence regarding any specific prospective contract with Sega. Therefore, it has necessarily failed to show that Epic induced Sega not to enter into such a contract, that Epic intended to induce Sega not to enter into it, or that but for Epic's conduct Sega would have entered into it. As with SK's relationship with Microsoft, any harm to its relationship with Sega arising from Epic's conduct is best deemed a consequence of Epic's alleged fraud, negligent

---

[12] Specifically, Sherlock, as Sega's 30(b)(6) witness, was asked, "When, if ever, did Epic try to persuade Sega not to perform any obligations it had with Silicon Knights?" He answered, over an objection to the form of the question, "I don't think Sega—sorry I don't think Epic—I don't think that took place." (Jeremy Sherlock Dep. 250:4-11).

29

misrepresentation, and breach of the License Agreement, not the basis for separate intentional interference claims.

Thus, SK has not raised genuine issues of material fact with respect to each element of its interference claims relating to the Sega agreement. Nor, for the same reasons, has SK shown that the portion of its interference claims relating to its relationship with Sega constitutes a separate tort claim immune from the economic loss rule. Because this portion of SK's interference claims fails, as does the portion relating to the Microsoft agreement, Epic's motion for summary judgment should be allowed with respect to SK's interference claims in their entirety.

**D. Unfair Competition**

As indicated, both of SK's unfair competition claims, for UDTPA violations and common law unfair competition, are subject to Epic's summary judgment motion. To establish a UDTPA violation, a plaintiff must show (1) an unfair or deceptive act or practice (2) in or affecting commerce (3) which proximately caused actual injury to the plaintiff or to his business. N.C. Gen. Stat. § 75-1.1; *Kelly*, 671 F. Supp. 2d at 798 (citing *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001)); *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 71-72, 653 S.E.2d 393, 399 (2007); *RD & J Props. v. Lauralea-Dilton Enters., LLC*, 165 N.C. App. 737, 748, 600 S.E.2d 492, 500 (2004). "The conduct must be immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Kelly*, 671 F. Supp. 2d at 798-99. Whether an act or practice is unfair or deceptive under the UDTPA is an issue of law for the court, which may be resolved on summary judgment. *See, e.g., Tucker v. Boulevard at Piper Glen LLC*, 150 N.C. App. 150, 153, 564 S.E.2d 248, 250 (2002).

30

A UDTPA claim cannot "piggyback" on a contract claim, even when the contract is breached intentionally. *Broussard*, 155 F.3d at 347; *Wachovia Bank and Trust Co. v. Carrington Devel. Assoc.*, 119 N.C. App. 480, 459 S.E.2d 17, 21 (1995). "[A] mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. 75-1.1." *Branch Bank & Trust Co. v.* Thompson, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992). Where a plaintiff has properly asserted a fraud claim, however, a UDTPA claim may necessarily follow. *Metropolitan Group*, 2010 WL 5056771, at * 6 ("[I]t is well established that a plaintiff who proves fraud thereby establishes that unfair or deceptive trade practices have occurred.") (citing *Jones v. Harrelson & Smith Contrs.*, 194 N.C. App. 203, 670 S.E.2d 242, 252 (2008)). Similarly, fraud can constitute the necessary "substantial aggravating circumstances" to permit a UDTPA claim in a contract based action. *Metropolitan Group*, 2010 WL 5056771, at *6.

The standard for violation of the UDTPA and common law unfair competition are not "appreciably different." *BellSouth Corp. v. White Directory Publrs., Inc.*, 42 F. Supp. 2d 598, 615 (M.D.N.C. 1999) (citing *Carolina Aniline & Extract Co., Inc. v. Ray*, 221 N.C. 269, 20 S.E.2d 59, 61-62 (1942)). Indeed, the parties here treat the two claims collectively.

Epic contends that SK's unfair competition claims fail because SK has shown nothing more than alleged violations of the License Agreement and none of the aggravating circumstances needed to support an unfair competition claim. But the court has already found that SK's claim of fraud has sufficient support in the record to survive summary judgment. This evidence of fraud is also sufficient to establish for purposes of summary judgment the aggravating circumstances necessary for SK's unfair competition claims. This same evidence establishes the unfair competition claims

31

as independent claims not precluded by the economic loss rule. Epic's motion for summary judgment should therefore be denied with respect to SK's unfair competition claims.

### E. Unjust Enrichment

Epic's motion includes SK's unjust enrichment claim. By that claim, SK seeks to recoup not only the license fee it paid Epic, but also revenues Epic earned on its games on the rationale that Epic wrongfully used SK's license fee to invest in those games.

There are three elements in a claim for unjust enrichment, otherwise known as quantum meruit: "(1) services were rendered to the defendant; (2) the services were knowingly and voluntarily accepted; and (3) the services were not given gratuitously." *TSC Research, LLC v. Bayer Chems. Corp.*, No. 1:06CV701, 2009 WL 2168965, at *6 (M.D.N.C. 16 Jul. 2009) (citing *Scott v. United Carolina Bank*, 130 N.C. App. 426, 429, 503 S.E.2d 149, 152 (1998)). Unjust enrichment claims require "a showing that both parties understood that services were rendered with the expectation of payment." *Scott*, 130 N.C. App. at 429, 503 S.E.2d at 152. Unjust enrichment serves as an equitable remedy to prevent unjust enrichment when there is no express contract. *Whitfield, P.A. v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 414-15 (1998). It is based upon a quasi-contract or contract implied in law. *Id.*

Epic argues that where, as here, a contract was in place that defined the parties' rights, a claim for unjust enrichment will not lie. The court agrees. *See Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 72 Fed. Appx. 916, 923 (4th Cir. 2003) (noting that it is only where there is no express contract that a party may assert a claim for unjust enrichment) (citing *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988) ("If there is a contract between the parties the contract governs the claim and the law will not imply a contract.")); *Atlantic and East Carolina Ry.*

32

*Co. v. Wheatly Oil Co., Inc.*, 163 N.C. App. 748, 753, 594 S.E.2d 425, 429 (2004) ("The doctrine of unjust enrichment is based on 'quasi-contract' or contract 'implied in law' and thus will not apply here where a contract exists between two parties.") (citing *Delta Envtl. Consultants, Inc. v. Wysong & Miles Co.*, 132 N.C. App. 160, 165, 510 S.E.2d 690, 694 (1999) ("It is well established that if there is a contract between the parties, the contract governs the claim and the law will not imply a contract . . . [in such cases] an action for breach of contract, rather than unjust enrichment, is the proper cause of action") (internal citations and quotation marks omitted)). While SK is correct that a party may plead breach of contract and unjust enrichment in the alternative in a complaint, *see Performance Sales & Mktg., LLC v. Lowe's Cos., Inc.*, No. 5:07-CV-140, 2010 WL 2294323, at \*5 (W.D.N.C. 4 Jun. 2010), at this, the summary judgment stage, SK has failed to come forward with any evidence sufficient to raise a question as to the validity of the License Agreement and thereby to adequately support its unjust enrichment claim. SK makes arguments about the scope of its potential recovery on an unjust enrichment claim, but they are inapposite to whether it may pursue such a claim in the first place, which it may not.

Epic's motion for summary judgment should accordingly be allowed as to SK's claim for unjust enrichment. Having made this determination, the court declines to address as moot the viability of the unjust enrichment claim under the economic loss rule.

### III.     SK'S CLAIM FOR RESCISSION OR REFORMATION

Epic also moves for judgment on SK's claim for rescission or reformation. By that claim, SK seeks to have the License Agreement rescinded due to Epic's alleged fraud or have it reformed to comport with the actual agreement of the parties.

33

A "court may order the rescission of an agreement induced by fraud or mistake." *Maurer v. SlickEdit, Inc.*, No. 04CVS10527, 2005 WL 1412496, at \*13 (N.C. Super. 16 May 2005) (citing *Mills v. Dunk*, 263 N.C. 742, 746, 140 S.E.2d 358, 361 (1965)). A right to rescind, however, must be exercised promptly. *Nakell v. Liner Yankelevitz Sunshine & Regenstreif, LLP*, No. 1:04CV820, 2006 WL 3848697, at \*4 (M.D.N.C. 29 Dec. 2006) ("[T]he right to rescind must be exercised promptly, and if there is unreasonable delay, the right is lost, and the defrauded party is generally relegated to his action for damages.") (quoting *Van Gilder v. Bullen*, 159 N.C. 291, 295, 74 S.E. 1059, 1060 (1912)); *see also Willis v. Willis,* 203 N.C. 517, 522, 166 S.E. 398, 401 (1932) ("'It is also a general principle that a person who knows that he is entitled to rescind a contract cannot wait until suit is brought for payment or other enforcement of the contract and then set up his grounds of rescission, or at least, such a course is regarded with great disfavor by the courts if there has been any considerable lapse of time since his discovery of the facts."). "Reformation is a well-established equitable remedy used to reframe written instruments where, through mutual mistake or the unilateral mistake of one party induced by the fraud of the other, the written instrument fails to embody the parties' actual, original agreement." *Capparelli v. AmeriFirst Home Imp. Finance Co.,* 535 F. Supp. 2d 554, 564 (E.D.N.C. 2008) (quoting *Metro. Prop. & Cas. Ins. Co. v. Dillard*, 126 N.C. App. 795, 798, 487 S.E.2d 157, 159 (1997)).

The court finds that, as Epic argues, the rescission claim fails because SK did not timely assert its claim for rescission. Although SK contends that it discovered Epic's alleged fraud in May of 2006 and notified Epic of its dissatisfaction within a few months, it did not request rescission until it filed this lawsuit in July of 2007, over a year later. The complaints upon which SK relies, from September and October of 2006, do not contain demands for rescission, but instead show that SK

34

sought to re-negotiate the agreement to avoid litigation. (*See, e.g.*, 1 Oct. 2006 email from Denis Dyack (D.E. 563-6) (proposing to end exclusivity arrangement between the parties if acceptable to Epic); 20 Sept. 2006 email from Denis Dyack (D.E. 563-7) (suggesting that the parties discuss a new deal between them); 21 Sept. 2006 email from Denis Dyack (D.E. 563-8) (identifying SK's complaints regarding the UE3 and SK's willingness for Epic to address those concerns)).[13] Having failed to opt for rescission in a timely manner, SK cannot now pursue it. *See Nakell*, 2006 WL 3848697, at *16 (allowing summary judgment dismissing rescission claim where plaintiff delayed two months after discovery of fraud before demanding rescission); *Van Gilder*, 159 N.C. at 295, 74 S.E.2d at 1060.

The court finds that SK's reformation claim also fails. As Epic contends, SK has not identified any omitted terms that the parties agreed to, but did not include in the License Agreement. While SK is correct that a party may base reformation on the omission of terms due to fraud, it is still required that there be missing terms upon which the parties agreed. *See Light v. Equitable Life Assur. Soc. of the U.S.*, 56 N.C. App. 26, 32-33, 286 S.E. 2d 868, 872 (1982). SK's reformation claim is independent of its contract breach claims and, contrary to SK's contention, the fact that the breach claims are proceeding to trial does not somehow require the reformation claim to proceed as well. Accordingly, Epic's motion for summary judgment should be allowed with respect to SK's claim for rescission or reformation.

---

[13] These are SK's Exs. 77-79, cited in SK's Mem. 13 n.67.

## IV.  EPIC'S COPYRIGHT INFRINGEMENT CLAIM

### A.  Overview of Claim

The final claim upon which Epic moves for summary judgment is its own claim for copyright infringement.  By its claim, Epic contends that SK infringed its copyright by using the UE3 to develop the SKE and videogames other than *Too Human*, the game expressly authorized under the License Agreement. programmer

Computer programs are subject to copyright protection. *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 142 (5th Cir. 2004); *see also Kramer Mfg.. Co. v. Andrews*, 783 F.2d 421, 436 (4th Cir. 1986) (finding that "[i]f other programs can be written or created which perform the same function as the [programmer's] operating system program, then the program is an expression of an idea and hence copyrightable") (citations omitted); *Tegg Corp. v. Beckstrom Elec. Co.*, No. 08-435, 2008 WL 5101358, at \*7 (W.D. Pa. 26 Nov. 2008) ("It is well-settled that computer source codes may be protected by copyright.").  Such protection includes both the literal elements of computer software (*i.e.*, the source code and object code) as well to the computer program's nonliteral elements (*i.e.*, its structure, sequence, organization, user interface, screen displays, and menu structures). *Gen. Universal*, 379 F.3d at 142.

There are two basic elements to a copyright infringement claim.  A plaintiff must show both (1) that it owned a valid copyright in the product at issue and (2) that defendant copied the constituent elements of the work. *Darden v. Peters*, 488 F.3d 277, 285 (4th Cir. 2007).  "Copying is a 'shorthand reference to the act of infringing any of the copyright owner's five exclusive rights set forth at 17 U.S.C. § 106.'" *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3rd Cir. 2002).  These rights include, in relevant part, the right to reproduce the

36

copyrighted work, to prepare derivative works based upon the copyrighted work, and to distribute copies of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending. 17 U.S.C. § 106(1)-(3). Epic contends that the record shows satisfaction of each element as a matter of law.

## B. Epic's Ownership of Valid Copyright for the UE3

Epic contends that it is undisputed that its owns six valid copyrights for the UE3. SK argues that while Epic's copyright registrations reflect registration of an "Engine Computer Program" called "UE3," there are serious factual questions about what those registrations cover. It argues that much of what Epic alleges it copied from the UE3 is not validly protected by copyright because, among other reasons, it was in the public domain or dictated by efficiency. The court need not resolve whether issues of fact are presented on this element of Epic's claim, however, because it is evident that there are triable issues on the second element, whether SK unlawfully copied the UE3.

## C. Copying by SK of Constituent Elements of the UE3

A plaintiff can prove copying through direct or indirect evidence. *Harvester, Inc. v. Rule Joy Trammell + Rubio, LLC*, 716 F. Supp. 2d 428, 445 (E.D. Va. 2010). Direct evidence includes judicial admissions of copying by a party in pleadings and evidentiary admissions in testimony. *See, e.g., M. Kramer Manufacturing Co. Inc. v. Andrews et al.*, 783 F.2d 421, 445 (4th Cir. 1986) ("If there was clear proof of actual copying by the defendants, that is the end of the case.").

Indirect evidence is proof "establishing that the defendant had access to the copyrighted work and that the defendant's work is 'substantially similar' to the protected material." *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 801 (4th Cir. 2001) (citing *Towler v. Sayles*, 76 F.3d 579,

37

581-82 (4th Cir. 1996)). Access can, of course, be readily shown where, as here, there is a license agreement for use of the copyrighted work.

To prove that two products are substantially similar, the court must assess whether the two works are extrinsically and intrinsically similar. *Tessler v. NBC Universal, Inc.*, No. 2:08cv234, 2009 WL 866834, at *4 (E.D. Va. 31 Mar. 2009). The products are deemed "extrinsically similar" where they "contain substantially similar ideas that are subject to copyright protection," and "intrinsically similar" where "they express those ideas in a substantially similar manner from the perspective of the intended audience of the work." *Lyons*, 243 F.3d at 801 (quoting *Towler*, 76 F.3d at 583-84). The issue of whether two products are substantially similar is frequently not appropriate for resolution on a motion for summary judgment. *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1247 (11th Cir. 1999) ("Summary judgment historically has been withheld in copyright cases because courts have been reluctant to make subjective determinations regarding the similarity between two works. However, non-infringement may be determined as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.") (citations omitted); *Integrated Bar Coding Sys. Co. v. Wemert*, No. 04-60271, 2007 WL 496464, at *4 (E.D. Mich. 12 Feb. 2007) ("In copyright infringement cases, granting summary judgment, particularly in favor of a defendant, is a practice to be used sparingly, but a court may compare the two works and render a judgment for the defendant on the ground that as a matter of law a trier of fact would not be permitted to find substantial similarity.") (internal quotations omitted). While conceptually the distinction between

38

direct and indirect evidence may be clear, it is not always so apparent when applied to particular pieces of evidence.

Here, Epic contends that it has established unauthorized copying of its protected work as a matter of law through both direct or indirect evidence of copying. The court now turns to an analysis of this argument.

### 1. Direct Evidence of Copying by SK

As direct evidence of copying, Epic points to SK's admissions in its complaint, testimony on its behalf, and other materials stating that it copied the UE3 in developing SKE and games other than *Too Human*. (*See, e.g.*, Compl. ¶¶ 21, 57, 59, 63; Reply to Countercl.(D.E. 19) ¶ 22; Sean Thompson Dep. (D.E. 534-2) 178:10-180:16; 13 April 2007 email from James O'Reilly (D.E. 535-8) (containing an estimation of the number of lines of Epic code that remained in the SKE)). This showing is insufficient to support its motion. The court finds that there are issues of material fact on the question of direct evidence of copying.

Indeed, the court already made this determination in its Order of 23 August 2010 (D.E. 572) adopting the Memorandum and Recommendation ("M&R") of 22 July 2010 (D.E. 556) and denying SK's motion for partial summary judgment on Epic's infringement claim (D.E. 418). Although the record has undergone further development since denial of SK's motion, the court's determination that there are issues of material fact and the grounds upon which it made this determination remain valid. (*See* 22 July 2010 M&R 10-12; *see also id.* 12-15).[14]

---

[14] On SK's motion, direct evidence was deemed to encompass a broader range of evidence than is the case on the instant motion.

Moreover, SK was authorized to copy and use the UE3 code for certain purposes under the License Agreement. Thus, to establish its infringement claim, Epic must show that any copying was not authorized by the License Agreement. It is clear from Epic's memorandum and reply that unauthorized copying is the concern of its motion. (*See, e.g.*, Def. Mem. 37 ("[SK's] *unauthorized* use of the UE3, outside the bounds of the License Agreement, establishes infringement and warrants summary judgment for Epic." (emphasis added)).

There are genuine issues of material fact with respect to whether the alleged copying by SK was authorized under the License Agreement. For example, SK contends that the SKE constitutes a permissible enhancement of the UE3 within the meaning of the License Agreement and that games developed using the SKE are not thereby unauthorized. Epic argues that both the SKE and games using it are unauthorized uses of the UE3. Resolution of this question depends on the meaning of the License Agreement, including specifically the term "Enhancements." Both parties essentially concede, and the court agrees, that such matters of contract interpretation are not suitable for summary judgment.

The issues of material fact regarding the existence of direct evidence of unauthorized copying by SK precludes summary judgment on this question. Epic's motion should accordingly be denied with respect to this aspect of its infringement claim.

## 2. Indirect Evidence of Copying by SK

As for indirect evidence of copying, there is no dispute, of course, on the first requirement that Epic had access to the UE3. On the second requirement, Epic argues that the UE3 and SKE and the allegedly unauthorized games are substantially similar as a matter of law. It relies primarily on the opinions of its expert, Edward Felton, that the SKE and allegedly unauthorized games contain

40

numerous instances of literal copying from the UE3 (*e.g.*, substantially similar or identical code), copying of errors from the UE3, and non-literal copying from the UE3 (*e.g.*, similarities in design and structure not dictated by efficiency). (*See* Expert Report of Edward Felton (D.E. 532-3) ¶¶ 42-52). Again, though, Epic fails to establish the absence of genuine issues of material fact.

One reason is that the court already determined in its ruling on SK's motion for partial summary judgment that there are genuine issues of material fact regarding the question of indirect evidence of copying, as it did regarding direct evidence of copying. That determination and the grounds for it remain valid.

As discussed in the 22 July 2010 M&R, a principal basis for the court's determination was that SK has presented the opinions of its expert, Robert Young, that challenge Felton's opinions. (*See* Expert Report of Robert Young (D.E. 535-9) ¶¶ 30-37); 22 July M&R 10-15). The instant motion also focuses on the differences in the opinions of these two experts. The assessment of the expert opinions supporting each party's position is a matter for resolution by the jury, not the court. *Med. Informatics Eng'g, Inc. v. Orthopaedics NE, P.C.*, No. 1:06-CV-173, 2008 WL 4099110, at *10 (N.D. Ind. 2 Sept. 2008) ("Resolution of this [copyright infringement] claim also will likely turn substantially on expert testimony and it is the domain of a jury to determine the weight and credibility of such testimony."); *Seastrunk v. Darwell Integrated Tech., Inc.*, No. 3:05-CV-0531, 2008 WL 190316, at *5 (N.D. Tex. 22 Jan. 2008) (denying motion for summary judgment on copyright infringement claim where "[t]he conflicting expert opinions create a genuine issue of material fact as to whether there is substantial similarity between [plaintiff's] and [defendant's] code").

41

Moreover, as with direct evidence of copying, a question exists whether any copying by SK shown through indirect evidence was authorized by the License Agreement. Again, interpretation of the License Agreement is a matter for the jury.

The court concludes that Epic has failed to establish the absence of genuine issues of material fact as to both direct and indirect evidence of copying by SK. Summary judgment should therefore be denied in its entirety with respect to Epic's claim for copyright infringement. *Med. Informatics*, 2008 WL 4099110, at *10 (denying summary judgment on copyright infringement claim nothing that "extensive technical arguments and evidence presented by the parties serve only to illustrate" the presence of material fact and credibility issues); *X-IT Prod., L.L.C. v. Walter Kidde Portable Equip., Inc.* 155 F. Supp. 2d 577, 614 (E.D. Va. 2001) (holding that whether two products were substantially similar was largely an issue of fact not appropriate for resolution on cross-motions for summary judgment).

## CONCLUSION

For the foregoing reasons, it is RECOMMENDED that Epic's motion (D.E. 531) for summary judgment be allowed in part and denied in part as follows:

1.    Epic's motion for summary judgment be ALLOWED as to SK's claims for intentional interference with contractual relations (third cause of action), intentional interference with prospective economic advantage (fourth cause of action), unjust enrichment (eighth cause of action), and rescission or reformation (ninth cause of action), and these claims be DISMISSED with prejudice;

2.    Epic's motion for summary judgment be DENIED as to SK's claims for fraud (first cause of action), negligent misrepresentation (second cause of action), UDTPA violations (sixth

42

cause of action), common law unfair competition (seventh cause of action), and Epic's counterclaim for copyright infringement (first counterclaim); and

3.      This case thereby proceed to trial on the immediately foregoing claims and the claims not subject to Epic's motion, namely:  SK's claims for breach of warranty (fifth cause of action), common law breach of contract (tenth cause of action), breach of contract under the UCC (eleventh cause of action), and declaratory judgment (twelfth cause of action), and Epic's counterclaims for breach of contract (second counterclaim), trade secret misappropriation (third counterclaim), and a constructive trust (fourth counterclaim).

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who shall have until 4 February 2011 to file written objections.  Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.  Any responses to objections shall be filed within 10 calendar days after service of the objections or by 15 February 2011, whichever is earlier.

Because this Memorandum and Recommendation contains information that may be considered confidential by a party, the Clerk is directed to file it under temporary seal.  Any party wishing this Memorandum and Recommendation to remain under permanent seal shall file a motion seeking such relief by 9 February 2011.  Any response to such a motion shall be filed by 16 February 2011.  In the event no party files a motion to permanently seal this Memorandum and Recommendation by 9 February 2011, the Clerk shall unseal it without further order of the court.

43

In the event a motion to seal is timely filed, this Memorandum and Recommendation shall remain under temporary seal pending ruling on the motion.

SO ORDERED, this 25th day of January 2011.

_____
James E. Gates
United States Magistrate Judge