IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:07-CV-275-D

| | |
|---|---|
| SILICON KNIGHTS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )　　**ORDER** |
| | ) |
| EPIC GAMES, INC., | ) |
| | ) |
| Defendant. | ) |

On May 30, 2012, after an eleven-day trial and one day of deliberations, a jury returned a

verdict against Silicon Knights, Inc. ("Silicon Knights" or "plaintiff") [D.E. 802]. The jury found

that Silicon Knights failed to prove its breach of contract claim, and that Epic Games, Inc. ("Epic

Games" or "defendant") had proven its breach of contract, copyright infringement, and trade secret

misappropriation counterclaims. Id. 1–3. The jury awarded Epic Games $2,650,000.00 for its

breach of contract counterclaim, and $1,800,000.00 for its copyright infringement and trade secret

misappropriation counterclaims. Id. 2–3. On May 30, 2012, the court entered a judgment reflecting

the jury's verdict [D.E. 804]. Thereafter, in accordance with a schedule that this court set, Silicon

Knights and Epic Games filed numerous post-trial motions.

On June 13, 2012, Silicon Knights moved to stay execution and enforcement of the judgment.

See Pl.'s Mot. Stay [D.E. 808]. On June 20, 2012, Epic Games responded in opposition. See Def.'s

Mem. Opp'n Mot. Stay [D.E. 811]. On July 6, 2012, Silicon Knights replied. See Pl.'s Reply Mot.

Stay [D.E. 827].

On July 2, 2012, Epic Games moved for costs. See Def.'s Mot. Costs [D.E. 813]. On August

1, 2012, Silicon Knights moved to disallow Epic Games's costs, see Pl.'s Mot. Disallow Costs [D.E.

838], and filed a supporting memorandum. See Pl.'s Mem. Supp. Mot. Disallow Costs [D.E. 839]. On August 16, 2012, Epic Games replied. See Def.'s Reply Mot. Costs [D.E. 842].

On July 2, 2012, Epic Games moved for an award of attorney's fees, see Def.'s Mot. Attorney's Fees [D.E. 814], and filed a supporting memorandum. See Def.'s Mem. Supp. Mot. Attorney's Fees [D.E. 815]. On August 1, 2012, Silicon Knights responded in opposition. See Pl.'s Mem. Opp'n Mot. Attorney's Fees [D.E. 837]. On August 16, 2012, Epic Games replied. See Def.'s Reply Mot. Attorney's Fees [D.E. 843].

On July 2, 2012, Epic Games moved to amend the judgment, see Def.'s Mot. Amend J. [D.E. 816], and filed a supporting memorandum. See Def.'s Mem. Supp. Mot. Amend J. [D.E. 817]. On August 1, 2012, Silicon Knights responded in opposition. See Pl.'s Mem. Opp'n Mot. Amend J. [D.E. 835]. On August 16, 2012, Epic Games replied. See Def.'s Reply Mot. Amend J. [D.E. 841].

On July 2, 2012, Silicon Knights moved to alter the judgment by remittitur, see Pl.'s Mot. Remittitur [D.E. 818], and filed a supporting memorandum. See Pl.'s Mem. Supp. Mot. Remittitur [D.E. 819]. On August 1, 2012, Epic Games responded in opposition. See Def.'s Mem. Opp'n Mot. Remittitur [D.E. 830]. On August 16, 2012, Silicon Knights replied. See Pl.'s Reply Mot. Remittitur [D.E. 845].

On July 2, 2012, Epic Games moved for a permanent injunction, see Def.'s Mot. Inj. [D.E. 820], filed a supporting memorandum, see Def.'s Mem. Supp. Mot. Inj. [D.E. 821], filed a proposed sealed exhibit in support of its motion for a permanent injunction [D.E. 822], and moved to seal the proposed sealed exhibit [D.E. 823]. On August 1, 2012, Silicon Knights responded in opposition. See Pl.'s Mem. Opp'n Mot. Inj. [D.E. 836]. On August 16, 2012, Epic Games replied. See Def.'s Reply Mot. Inj. [D.E. 844].

On July 2, 2012, Silicon Knights moved for judgment as a matter of law, see Pl.'s Mot. J.

2

as Matter of Law [D.E. 824], and filed a supporting memorandum. See Pl.'s Mem. Supp. Mot. J. as Matter of Law [D.E. 825]. On August 1, 2012, Epic Games responded in opposition, see Def.'s Mem. Opp'n Mot. J. as Matter of Law [D.E. 831], and moved to seal the response and first two attached exhibits [D.E. 833]. On August 16, 2012, Silicon Knights replied. See Pl.'s Reply Mot. J. as Matter of Law [D.E. 846].

On July 25, 2012, Epic Games moved to compel complete responses to its post-judgment interrogatories and requests for production, see Def.'s Mot. Compel [D.E. 828], and filed a supporting memorandum. See Def.'s Mem. Supp. Mot. Compel [D.E. 829]. On August 8, 2012, Silicon Knights responded in opposition. See Pl.'s Mem. Opp'n Mot. Compel [D.E. 840].

As explained below, the court denies as moot Silicon Knights's motion to stay, grants in part and denies in part Epic Games's motion for costs, grants in part and denies in part Silicon Knights's motion to disallow costs, grants in part and denies in part Epic Games's motion for attorney's fees and expert witness fees, grants in part and denies in part Epic Games's motion to amend the judgment, denies Silicon Knights's motion to alter the judgment by remittitur, grants in part and denies in part Epic Games's motion for a permanent injunction, grants Epic Games's motion to seal the exhibit filed in support of its motion for a permanent injunction, denies Silicon Knights's motion for judgment as a matter of law, grants Epic Games's motion to seal its response to Silicon Knights's motion for judgment as a matter of law and the first two exhibits attached to that response, and grants Epic Games's motion to compel.

I.

Silicon Knights asks the court to stay the execution and enforcement of the judgment until the parties have submitted, and the court has considered, all post-trial motions. See Pl.'s Mot. Stay 2–3. The deadline for submitting post-trial motions, responses, and replies has passed. See [D.E.

3

806, 810]. All post-trial motions and the parties' arguments supporting and opposing those motions are ripe, and this order resolves the pending motions. Thus, the court denies as moot Silicon Knights's motion to stay.

II.

As for Epic Games's motion for costs, Epic Games seeks an award of $280,910.24. See Def.'s Mot. Costs 1. Federal Rule of Civil Procedure 54(d)(1) governs a post-judgment motion for an award of costs. See Fed. R. Civ. P. 54(d)(1). Rule 54(d)(1) provides that "costs—other than attorney's fees—should be allowed to the prevailing party." Id. A "prevailing party" is "a party in whose favor a judgment is rendered" or "one who has been awarded some relief by the court." Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 603 (2001) (quotation and alteration omitted). "[T]he rule gives a presumption in favor of an award of costs to the prevailing party." Teague v. Bakker, 35 F.3d 978, 996 (4th Cir. 1994); see Delta Air Lines, Inc. v. August, 450 U.S. 346, 352 (1981). However, a district court has discretion to award or deny costs to the prevailing party. See Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 441–42 (1987), superseded on other grounds by statute, 42 U.S.C. § 1988; Couram v. S.C. Dep't of Motor Vehicles, Civil Action No. 3:10-00001-MBS, 2011 WL 6115509, at *2 (D.S.C. Dec. 8, 2011) (unpublished). A court "must justify its decision to deny costs by articulating some good reason for doing so." Cherry v. Champion Int'l Corp., 186 F.3d 442, 446 (4th Cir. 1996) (quotation and citations omitted); see Teague, 35 F.3d at 996. A losing party's good faith is insufficient, standing alone, to justify denying costs to a prevailing party. Cherry, 186 F.3d at 446. Instead, a losing party's good faith is a "virtual prerequisite" to a denial of costs in favor of the prevailing party. Id. Upon a finding of the losing party's good faith, the court may deny an award of costs when "there would be an element of injustice in a presumptive cost award." Id.; see Delta Air Lines, 450 U.S.

4

at 355 n.14. The factors that a court should consider to determine whether such an element of injustice would arise from an award of costs are: "(1) misconduct by the prevailing party; (2) the unsuccessful party's inability to pay the costs; (3) the excessiveness of the costs in a particular case; (4) the limited value of the prevailing party's victory; or (5) the closeness and difficulty of the issues decided." Ellis v. Grant Thornton LLP, 434 F. App'x 232, 235 (4th Cir. 2011) (per curiam) (unpublished); see Cherry, 186 F.3d at 446–47.

When an award of costs to the prevailing party is appropriate, the court looks to federal law to determine the scope of the award. See Crawford Fitting, 482 U.S. at 441–43. Section 1920 of Title 28 of the United States Code lists taxable costs. 28 U.S.C. § 1920; see Crawford Fitting, 482 U.S. at 441 ("[Section] 1920 defines the term 'costs' as used in Rule 54(d).").[1] Section 1920's list of recoverable costs is exhaustive as to "expenses that a federal court may tax under the discretionary authority found in Rule 54(d)." Crawford Fitting,482 U.S. at 441–42. Accordingly, "Rule 54(d) does not provide authority to tax as costs those expenses not enumerated in [section]

---

[1] Taxable costs under section 1920 include:

(1) Fees of the clerk and marshal;

(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5) Docket fees under section 1923 . . . ;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services . . . ."

28 U.S.C. § 1920.

1920." Herold v. Hajoca Corp., 864 F.2d 317, 323 (4th Cir. 1988); see Crawford Fitting, 482 U.S. at 441–42.

A court's local rules also may impact a party's ability to recover costs. Pursuant to Federal Rule of Civil Procedure 83, "a district court . . . may adopt and amend rules governing its practice." See Fed. R. Civ. P. 83(a)(1). Local rules promulgated pursuant to Rule 83 "have the force and effect of law, and are binding upon the parties and the court which promulgated them." Jackson v. Beard, 828 F.2d 1077, 1078 (4th Cir. 1987) (quotation omitted). District courts have "broad discretion to interpret their local rules [and] [o]nly in rare cases will [appellate courts] question the exercise of discretion in connection with the application of . . . local rules." Qualls v. Blue Cross of Cal., Inc., 22 F.3d 839, 842 n.2 (9th Cir. 1994) (quotations and citations omitted); see AM Props. v. Town of Chapel Hill, 202 F. Supp. 2d 451, 453–54 (M.D.N.C. 2002). District courts routinely apply local rules regulating the nature of recoverable costs. See, e.g., Couram, 2011 WL 6115509, at *1; Bland v. Fairfax Cnty., No. 1:10-CV-1030, 2011 WL 5330782, at *5 (E.D. Va. Nov. 7, 2011) (unpublished). This court has promulgated a local rule governing the recovery of costs. See Local Civil Rule 54.1.[2] Accordingly, this local rule further refines the scope of recoverable costs.

_____

[2] Local Civil Rule 54.1(c) provides a non-exhaustive list of normally recoverable costs:

(a) those items specifically listed on the bill of costs form. The costs incident to the taking of depositions (when allowable as necessarily obtained for use in the litigation) normally include only the reporter's fee and charge for the original transcript of the deposition;

(b) premiums on required bonds;

(c) actual mileage, subsistence, and attendance allowances for necessary witnesses at actual costs, but not to exceed the applicable statutory rates, whether they reside in or out of the district;

(d) one copy of the trial transcript for each party represented by counsel.

6

Silicon Knights concedes that Epic Games was the prevailing party and may recover costs. See Pl.'s Mot. Disallow Costs 1–2; Pl.'s Mem. Supp. Mot. Disallow Costs 2–6; see also [D.E. 802, 804]. Nonetheless, Silicon Knights challenges three specific categories of costs, which it claims Epic Games may not recover. The court examines each category seriatim.

First, Silicon Knights argues that Epic Games may not recover the $33,749.04 that Epic Games seeks for audiovisual recordings Epic Games made of depositions taken in this case. Pl.'s Mem. Supp. Mot. Disallow Costs 2–3; see [D.E. 813-2] 2–4. Silicon Knights asserts that the depositions were recorded by both audiovisual and stenographic means, that the audiovisual recordings were not necessary to preserve testimony for or present testimony at trial, and therefore that Epic Games may recover its costs for the stenographic transcription only. Pl.'s Mem. Supp. Mot. Disallow Costs 2–3.[3]

---

Local Civil Rule 54.1(c)(1). Local Civil Rule 54.1(c) also identifies items "normally not taxed, without limitation" as

(a) witness fees, subsistence, and mileage for individual parties, real parties in interest, parties suing in representative capacities, and the officers and directors of corporate parties;

(b) multiple copies of depositions;

(c) daily copy of trial transcripts, unless prior court approval has been obtained.

Local Civil Rule 54.1(c)(2).

[3] Silicon Knights also argues that Epic Games's summary table of deposition costs, [D.E. 813-2] 2–4, contains an error. Specifically, Silicon Knights contends that Daniel Vogel's November 20, 2009 deposition cost $769.10, not the $1,136.85 indicated in the summary table. Pl.'s Mem. Supp. Mot. Disallow Costs 3 n.2. Epic Games agrees that the cost is misstated, but contends that the deposition cost $776.10, not $769.10. Def.'s Reply Mot. Costs 1 n.1. Epic Games did not explain how it reached $776.10, and the court cannot reach that total based on the itemized costs provided in the corresponding bill. See [D.E. 813-2] 40. Thus, the court finds that Daniel Vogel's November 20, 2009 deposition cost $769.10.

Section 1920(2) permits a party to recover costs for videotaping a deposition and costs for transcribing a videotaped deposition. See Cherry, 186 F.3d at 448–49. Typically, a party may not recover costs for both unless the party proves that both audiovisual and stenographic recordings were necessary. Id. at 449; see Local Civil Rule 54.1(c)(2)(b). However, "when a party notices a deposition to be recorded by nonstenographic means, or by both stenographic and nonstenographic means, and no objection is raised at that time by the other party to the method of record[ing] pursuant to Federal Rule of Civil Procedure 26(c), it is appropriate under [section] 1920 to award the cost of conducting the deposition in the manner noticed." Morrison v. Reichhold Chems., Inc., 97 F.3d 460, 465 (11th Cir. 1996) (per curiam) (footnote omitted); accord Cherry, 186 F.3d at 449; Tilton v. Capital Cities/ABC, Inc., 115 F.3d 1471, 1477 (10th Cir. 1997). Here, Epic Games provided Silicon Knights notice that the depositions would be recorded by both audiovisual videotaping and stenographic transcription. See, e.g., [D.E. 842-1] ¶ 4; cf. [D.E. 813-2] 2–4. Silicon Knights did not object. See [D.E. 842-1] ¶ 4. Moreover, the court finds that transcribing and videotaping the depositions were "necessarily obtained for use in the case." 28 U.S.C. § 1920(2). Thus, pursuant to section 1920, the court awards Epic Games the $33,749.04 it paid to record the depositions by audiovisual videotaping, as well as the $55,411.41 Epic Games paid to record the depositions by stenographic means. See Tilton, 115 F.3d at 1477; Morrison, 97 F.3d at 464–65; see also [D.E. 813-2] 2–4.

Second, Silicon Knights argues that Local Civil Rule 54.1(c)(2)(a) prohibits Epic Games from recovering the $44.44 in witness fees, subsistence costs, and mileage costs Epic Games paid to witness Zachary Bishop, the $45.00 in witness fees, subsistence costs, and mileage costs Epic Games paid to witness Nick Penwarden, and the $138.00 Epic Games paid to subpoena witness Nick Penwarden. Pl.'s Mem. Supp. Mot. Disallow Costs 3–4; see [D.E. 813-1] 1; [D.E. 813-4] 1. Local

8

Civil Rule 54.1(c)(2)(a) precludes recovery of costs for "witness fees, subsistence, and mileage for individual parties, real parties in interest, parties suing in representative capacities, and the officers and directors of corporate parties." Local Civil Rule 54.1(c)(2)(a). Zachary Bishop is an attorney formerly employed by Hunton & Williams LLP in Raleigh, North Carolina, and currently employed by Wyrick Robbins Yates & Ponton LLP in Raleigh, North Carolina. Bishop Tr. May 24, 2012 AM [D.E. 858] at 76. Nick Penwarden is a graphics programmer who has been employed by Epic Games for approximately one year. Penwarden Tr. May 24, 2012 AM [D.E. 858] at 110. Zachary Bishop and Nick Penwarden testified at trial and do not fall into any of the categories for which Local Civil Rule 54.1(c)(2)(a) prohibits recovery of witness fees, subsistence costs, and mileage costs. Likewise, the $138.00 paid to subpoena Nick Penwarden is recoverable. See 28 U.S.C. § 1920(3). Accordingly, Epic Games may recover these costs.

Third, Silicon Knights argues that Epic Games is not entitled to recover certain costs for imaging electronic information produced in discovery in this case, or certain costs for creating four demonstrative exhibits used during Epic Games's closing argument. Pl.'s Mem. Supp. Mot. Disallow Costs 4–5. As for the costs associated with imaging electronic information for document production in this case, Epic Games seeks to recover $150,687.00 for imaging electronic information, plus an additional $2,152.34 for purchasing hard drives as part of that production process. See [D.E. 813-5] 1. In opposition, Silicon Knights asserts that such costs are not recoverable under section 1920(4). Pl.'s Mem. Supp. Mot. Disallow Costs 4–5. Alternatively, Silicon Knights argues that the costs are not properly documented. Id.

A prevailing party may recover "[f]ees for exemplification and the costs of making copies of any materials when the copies are necessarily obtained for use in the case." 28 U.S.C. § 1920(4). Courts of appeals have held that certain costs for imaging electronic information for production in

9

discovery can be recoverable under section 1920(4). See Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 674 F.3d 158, 167–68, 171 (3d Cir.), cert. denied, 2012 WL 2340866 (U.S. 2012); In re Ricoh Co., Ltd. Patent Litig., 661 F.3d 1361, 1365 (Fed. Cir. 2011); Hecker v. Deere & Co., 556 F.3d 575, 591 (7th Cir. 2009); BDT Prods., Inc. v. Lexmark Int'l, Inc., 405 F.3d 415, 420 (6th Cir. 2005), abrogated on other grounds by Taniguchi v. Kan Pac. Saipan, Ltd., 132 S. Ct. 1997 (2012). The Fourth Circuit has not considered whether costs of imaging electronic information for production in discovery can be recoverable under section 1920(4). However, district courts within the Fourth Circuit generally have held that a party may recover such costs where the record shows that the costs are the "costs of making copies" for production in discovery. See Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc., No. 5:06-CV-160-D, 2012 WL 776945, at *4–5 (E.D.N.C. Mar. 8, 2012) (unpublished); Mann v. Heckler & Koch Def., Inc., No. 1:08cv611 (JCC), 2011 WL 1599580, at *8 (E.D. Va. Apr. 28, 2011) (unpublished); Francisco v. Verizon S., Inc., 272 F.R.D. 436, 445–46 (E.D. Va. 2011). Furthermore, district courts outside the Fourth Circuit also have permitted a prevailing party to recover such costs under section 1920(4). See, e.g., Paradigm Alliance, Inc. v. Celeritas Techs., LLC, No. 07-1121-EFM, 2011 WL 3849724, at *1 (D. Kan. Aug. 30, 2011) (unpublished); Cargill, Inc. v. Progressive Dairy Solutions, Inc., No. CV-F-07-0349-LJO-SMS, 2008 WL 5135826, at *6 (E.D. Cal. Dec. 8, 2008) (unpublished).

Here, discovery was unusually extensive and Epic Games incurred $150,687.00 in costs in imaging electronic information for document production. See [D.E. 813-5] 1. The court finds that those costs fall within "the costs of making copies of any materials" and were "necessarily obtained for use in the case." 28 U.S.C. §1920(4).[4] Thus, if properly documented, Epic Games can recover

---

[4] Silicon Knights does not argue that Epic Games's costs of imaging electronic information were unnecessary. See Pl.'s Mem. Supp. Mot. Disallow Costs 4–5. Rather, Silicon Knights

10

them. See 28 U.S.C. §1920(4); Race Tires Am., Inc., 674 F.3d at 171; In re Ricoh Co., 661 F.3d at 1365; Hecker, 556 F.3d at 591.

"[N]o litigation costs should be awarded in the absence of adequate documentation . . . ." Trimper v. City of Norfolk, 58 F.3d 68, 77 (4th Cir. 1995). Here, Epic Games has provided adequate documentation to support its request for $150,687.00 in costs associated with imaging electronic information for document production. See [D.E. 813-5]. However, the court declines to award Epic Games the additional $2,152.34 in costs it incurred to purchase hard drives for document production. See [D.E. 813-5] 1. The hard drives are reusable. Such costs are properly considered overhead and are not recoverable. Accordingly, the court awards Epic Games $150,687.00 in costs associated with imaging electronic information produced in discovery. See 28 U.S.C. §1920(4).

As for the costs associated with producing four demonstrative exhibits Epic Games used in its closing argument, Epic Games seeks $1,050.42 it paid to create a timeline spanning two large, dry-erase boards ("timeline demonstratives"), one enlarged copy of defendant's exhibit 2383A, and one enlarged copy of defendant's exhibit 2389B. See [D.E. 813-5] 1; Def.'s Reply Mot. Costs 6. Silicon Knights argues that Epic Games cannot recover these costs. First, Silicon Knights argues that Epic Games has not identified the specific exhibits created and has not indicated whether the exhibits were actually used at trial. Pl.'s Mem. Supp. Mot. Disallow Costs 5. This argument fails. Epic Games's bill of costs indicates that the four demonstrative exhibits created were "36x48 Dry

_____

erroneously relies on a district court case that analyzes section 1920(4) before its amendment in 2008 to contend that such imaging does not constitute making "copies." Cf. Judicial Administration and Technical Amendments Act of 2008, Pub. L. No. 110-406, § 6, 122 Stat. 4291 (2008) (replacing "copies of papers" in section 1920(4) with "the costs of making copies of any materials"). Silicon Knights also erroneously relies on another district court case for the proposition that in order for the costs of making copies to be recoverable under section 1920(4), the copies must be filed with the court. Given that section 1920(4) references copies "obtained for use in the case" (28 U.S.C. §1920(4)), the court rejects Silicon Knights's argument concerning section 1920(4).

11

Erase Demonstrative [Exhibits] for Closing." [D.E. 813-5] 1. Only four such demonstrative exhibits were used during the closing argument—two timeline demonstratives, one enlarged copy of defendant's exhibit 2383A, and one enlarged copy of defendant's exhibit 2389B.

Second, Silicon Knights argues that Epic Games has not demonstrated that the four demonstrative exhibits were necessary. Pl.'s Mem. Supp. Mot. Disallow Costs 5. A party may recover costs for creating demonstrative exhibits used in the party's closing argument if the exhibits were "necessarily obtained for use in the case." 28 U.S.C. § 1920(4); see Cefalu v. Vill. of Elk Grove, 211 F.3d 416, 427–28 (7th Cir. 2000); Olivarius v. Tharaldson Prop. Mgmt. Inc., No. 08 C 463, 2012 WL 1117468, at *5 (N.D. Ill. Apr. 3, 2012) (unpublished). When considering whether a demonstrative exhibit was "necessarily obtained for use in the case," 28 U.S.C. § 1920(4), courts must determine whether "the exemplification [was] vital to the presentation of the information, or [whether it] was . . . merely a convenience or, worse, an extravagance." Cefalu, 211 F.3d at 428–29; see Irwin Indus. Tool Co. v. Worthington Cylinders Wisc., LLC, Civil No. 3:08cv291, 2010 WL 3895701, at *4 (W.D.N.C. Oct. 1, 2010) (unpublished) (collecting cases). To do so, courts may consider "whether the nature and context of the information being presented genuinely called for the means of illustration that the party employed." Cefalu, 211 F.3d at 428.

Here, both timeline demonstratives were "necessarily obtained for use in the case." 28 U.S.C. § 1920(4). Epic Games (through counsel) used the timeline demonstratives to illustrate for the jury the sequence of events referenced in Epic Games's closing argument regarding Silicon Knights's breach of contract claim and Epic Games's breach of contract counterclaim. See Epic Games Closing Tr. May 29, 2012 AM [D.E. 860] at 143–67. Such framing was necessary. During its closing argument, Epic Games repeatedly referenced the key dates and events (especially video game industry tradeshows and conferences unfamiliar to lay jurors) central to the disputed issues

12

concerning the May 10, 2005 license agreement ("License Agreement"). Epic Games repeatedly recounted much of the relevant trial testimony and displayed and discussed many trial exhibits relating to those dates and events. See id. Without the timeline demonstratives, Epic Games's closing argument may have overwhelmed the jurors, who did not possess the same intimate knowledge and command of the record that Epic Games's counsel did. With the timeline demonstratives, however, the jurors possessed the necessary framework within which to synthesize the evidence and evaluate Epic Games's arguments. Furthermore, the presentation of facts in Epic Games's closing argument was not always chronological. Epic Games periodically moved forward and backward in time as its argument and the supporting evidence dictated. The timeline demonstratives helped the jury to keep pace.

Finally, the presentation of the timeline as two large, dry-erase demonstrative exhibits was necessary. The courtroom in which this trial occurred is equipped with technology allowing parties to publish exhibits on individual monitors provided in the jury box to each juror. The courtroom technology also permits a party to highlight on, underline on, write on, circle portions of, enlarge portions of, and otherwise manipulate trial exhibits when presenting evidence or arguments to a jury. Nevertheless, the courtroom technology did not provide an adequate means of displaying Epic Games's timeline. After a brief introduction, Epic Games set up its timeline demonstratives at the beginning of its main argument on the parties' breach of contract claims, presenting both timeline demonstratives simultaneously. See id. at 143–44. Using both timeline demonstratives, Epic Games then reviewed with the jury the relevant chronology and made handwritten notes on the exhibits. See id. Epic Games left both timeline demonstratives displayed as it transitioned into the details of its closing argument. As Epic Games presented its argument, counsel repeatedly referenced the timeline demonstratives and counsel's handwritten notes on them. See id. at 143–167.

13

Concurrently, Epic Games used the courtroom technology to display and discuss myriad exhibits supporting Epic Games's arguments. See id. Despite the logistical complexity of Epic Games's presentation, counsel's closing argument was clear, coherent, and understandable. Such a presentation would not have been possible had Epic Games limited itself to the courtroom technology. The two large boards on which Epic Games divided its timeline allowed Epic Games to present the entire timeline to the jury at once and in an easily readable format. The courtroom technology, however, would have permitted only a single shrunken and unreadable slide, or two slides presented in an equally shrunken and unreadable split screen. Furthermore, had Epic Games relied exclusively on the courtroom technology to present its timeline, it would have had to juggle the timeline along with the numerous exhibits, and consequently would have lost the constant, overarching framework that made Epic Games's arguments understandable to the jury. Finally, if Epic Games had used the courtroom technology to present its timeline, it would have lost counsel's handwritten notes on the timeline whenever Epic Games displayed another exhibit to the jury. In short, Epic Games's timeline demonstratives were "necessarily obtained for use in the case," 28 U.S.C. § 1920(4), and Epic Games may recover the costs associated with creating them.

The enlarged copies of defendant's exhibits 2383A and 2389B, however, were not "necessarily obtained for use in the case." Id. Unlike counsel's constant use of the timeline demonstratives to frame its argument relating to the parties' breach of contract claims, Epic Games made only passing references to defendant's exhibits 2383A and 2389B to support specific parts of its argument regarding its copyright infringement and trade secret misappropriation counterclaims. As for defendant's exhibit 2383A, Epic Games displayed the enlarged copy to the jury, explained in one sentence the exhibit's importance to Epic Games's copyright infringement counterclaim, and then moved on to the next exhibit. See Epic Games Closing Tr. May 29, 2012 AM at 172–73. As

14

for Epic Games's use of the enlarged copy of defendant's exhibit 2389B, Epic Games enlarged only the first page of the 348-page exhibit, briefly explained why defendant's exhibit 2389B supported Epic Games's trade secret misappropriation counterclaim, and then asked the jury to "read [defendant's exhibit 2389B] yourself." Id. at 167–68. For Epic Games's limited use of defendant's exhibits 2383A and 2389B, the courtroom technology would have sufficed. These two demonstrative exhibits were not necessary, and Epic Games may not recover the costs associated with them. See 28 U.S.C. § 1920(4).

Epic Games's bill of costs indicates that one demonstrative exhibit cost $281.82 to create, and that the other three cost $256.20 each to create. See [D.E. 813-5] 1, 5–6. The bill of costs does not indicate which demonstrative exhibit cost what. See id. Accordingly, the court assumes that the timeline demonstratives cost $256.20 each to create. Thus, the court awards Epic Games $512.40 in costs related to the demonstrative exhibits Epic Games used in its closing arguments.

In sum, the court awards Epic Games $277,852.13 in costs.

III.

Epic Games seeks $2,201,813.51 in attorney's fees and $1,088,337.29 for the cost of Epic Games's testifying experts. See Def.'s Mot. Attorney's Fees 1. As for Epic Games's request for attorney's fees, Federal Rule of Civil Procedure 54(d)(2) requires a party to make "[a] claim for attorney's fees and related nontaxable expenses . . . by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Fed. R. Civ. P. 54(d)(2)(A). A motion for attorney's fees must (1) "be filed no later than 14 days after the entry of the judgment[,]" (2) "specify the judgment and the statute, rule, or other grounds entitling the movant to the award[,]" (3) "state the amount sought or provide a fair estimate of it[,]" and (4) "disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made." Fed.

15

R. Civ. P. 54(d)(2)(B).

Epic Games timely moved for attorney's fees and argues that paragraph 2(e)(iii) of the License Agreement, 17 U.S.C. § 505, and North Carolina General Statute § 66-154(d) support an award of $2,201,813.51 in attorney's fees. Def.'s Mem. Supp. Mot. Attorney's Fees 1–6; Def.'s Reply Mot. Attorney's Fees 1–8.

Under North Carolina law, "a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is expressly authorized by statute." Stillwell Enters., Inc. v. Interstate Equip. Co., 300 N.C. 286, 289, 266 S.E.2d 812, 814 (1980); see Nucor Corp. v. Gen. Bearing Corp., 333 N.C. 148, 154, 423 S.E.2d 747, 751 (1992); Hicks v. Albertson, 284 N.C. 236, 238, 200 S.E.2d 40, 42 (1973). A contractual provision obligating one party to pay another party's attorney's fees is not enforceable absent a statutory basis for an award of attorney's fees. Stillwell, 300 N.C. at 289, 266 S.E.2d at 814–15. There are certain equitable exceptions to this rule. See Ehrenhaus v. Baker, 717 S.E.2d 9, 32–35 (N.C. Ct. App. 2011). Epic Games does not contend that its request for attorney's fees falls into one of these exceptions. See Def.'s Mem. Supp. Mot. Attorney's Fees 2; Def.'s Reply Mot. Attorney's Fees 7–8.

Epic Games seeks attorney's fees for its breach of contract counterclaim based on paragraph 2(e)(iii) of the License Agreement. See Def.'s Mem. Supp. Mot. Attorney's Fees 2; Def.'s Reply Mot. Attorney's Fees 7–8. Epic Games cites no statute authorizing such an award, see Def.'s Mem. Supp. Mot. Attorney's Fees 2; Def.'s Reply Mot. Attorney's Fees 7–8, and the court has found none.[5]

---

[5] Although Epic Games has not cited it, the North Carolina General Assembly recently enacted N.C. Gen. Stat. § 6-21.6, which applies to all "business contracts" entered into on or after October 1, 2011. The statute permits a court or arbitrator to award reasonable attorney's fees and expenses if the "business contract" contains a "reciprocal attorney's fee provision." N.C. Gen. Stat. § 6-21.6. Because Epic Games and Silicon Knights entered the License Agreement on May 10, 2005, section 6-21.6 does not apply.

Thus, the court declines to award attorney's fees based on paragraph 2(e)(iii) of the License Agreement. See Stillwell, 300 N.C. at 289, 266 S.E.2d at 814–15.

Epic Games next seeks attorney's fees for its copyright infringement counterclaim based on 17 U.S.C. § 505. See Def.'s Mem. Supp. Mot. Attorney's Fees 3–5; Def.'s Reply Mot. Attorney's Fees 1–3. Section 505 provides that "[i]n any civil action under [the federal Copyright Act], . . . the court may . . . award a reasonable attorney's fee to the prevailing party." 17 U.S.C. § 505. Whether to award attorney's fees pursuant to section 505 is within the court's discretion. Fogerty v. Fantasy, Inc., 510 U.S. 517, 533–34 (1994). When determining whether to award attorney's fees under section 505, the court should consider four factors: (1) the parties' motivation, (2) the objective reasonableness of the parties' legal and factual positions, (3) the need for compensation and deterrence, and (4) any other factors that may warrant an award of attorney's fees. Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc., 74 F.3d 488, 498 (4th Cir. 1996); Diamond Star Bldg. Corp. v. Freed, 30 F.3d 503, 505 (4th Cir. 1994); Rosciszewski v. Arete Assocs., Inc., 1 F.3d 225, 234 (4th Cir. 1993).

As for the parties' motivation, willful infringement or bad faith by the infringing party is not required, but a court may consider it. See Rosciszewski, 1 F.3d at 234; ABC, Inc. v. Primetime 24, Joint Venture, 67 F. Supp. 2d 558, 563 (M.D.N.C. 1999), aff'd, 232 F.3d 886, 2000 WL 1648875 (4th Cir. 2000) (per curiam) (unpublished table decision). The parties' motivation is significant in this case. Despite Silicon Knights's contrary argument, see Pl.'s Mem. Opp'n Mot. Attorney's Fees 8, the evidence presented at trial overwhelmingly demonstrated that Silicon Knights willfully infringed Epic Games's copyrights. Over a prolonged time period, Silicon Knights repeatedly and deliberately copied Epic Games's copyrighted code into Silicon Knights's video game and game engine code. See, e.g., Def.'s Exs. 2383, 2383A, 2383D, 2384, 2387, 2387A, 2388, 2501. Silicon

17

Knights's copying included not only Epic Games's functional code, see Def.'s Exs. 2388, 2501, but also non-functional, internal comments Epic Games's programmers had left for themselves. See Def.'s Exs. 2383D, 2388, 2501. Silicon Knights even failed to remove or correct typographical errors Epic Games's programmers had made in those comments. See Def.'s Ex. 2383D.

Once Silicon Knights had copied Epic Games's copyrighted code into Silicon Knights's video game and game engine code, Silicon Knights initiated a prolonged coverup, removing Epic Games's copyright notices and disguising Epic Games's copyrighted code as Silicon Knights's own. See, e.g., Def.'s Exs. 2387, 2387A, 2400-01, 2507. Silicon Knights then covered up its coverup, until Silicon Knights's wrongdoing was revealed at trial through Epic Games's cross-examination and the court's own inquiries. See, e.g., Young Tr. May 25, 2012 PM (sealed) [D.E. 849-1] at 43-91; Tr. May 25, 2012 PM [D.E. 859-1] at 50-54; Tr. May 29, 2012 AM [D.E. 860] at 2-31. In short, Silicon Knights's infringement of Epic Games's copyrights was willful and in bad faith.

As for the objective reasonableness of the legal and factual positions the parties advanced regarding Epic Games's copyright infringement counterclaim, the court should consider "whether the positions advanced by the parties were frivolous . . . or well-grounded in law and fact." Rosciszewski, 1 F.3d at 234; see Primetime 24, 67 F. Supp. 2d at 563. Furthermore, the court should consider whether the claim presented complex or novel legal and factual issues. Primetime 24, 67 F. Supp. 2d at 563. "Ordinarily an award of attorney's fees is not appropriate in copyright cases involving novel, complex, or unsettled issues of law and fact." Id.

Silicon Knights contends that "discovery was extensive, contentious, and culminated in a 12-day trial," and that "[e]ven Epic [Games] admits that its [copyright infringement claim was] difficult and expensive to prove and that substantial work by Epic [Games] and its experts were [sic] required to develop the facts needed to prove the counterclaim[]." Pl.'s Mem. Opp'n Mot. Attorney's Fees

18

9 (quotations and alteration omitted). "Based on the admitted complexity of this case," Silicon Knights continues, "this Court should . . . deny [Epic Games's] request for fees . . . associated with its [copyright] infringement counterclaim." Id.

The court rejects Silicon Knights's argument. Uncovering Silicon Knights's copyright infringement was undoubtedly arduous and expensive. Epic Games's experts had to comb through millions of lines of code that Silicon Knights had meticulously sought to "clean" in order to remove Epic Games's copyright notices and to disguise Epic Games's copyrighted code as Silicon Knights's own. In other words, Silicon Knights's code cleanup effort made discovery of Silicon Knights's wrongdoing more difficult than it otherwise would have been. But that does not somehow render Epic Games's copyright infringement counterclaim factually complex. Likewise, Epic Games's copyright infringement counterclaim presented no complex, novel, or unsettled legal issues. The counterclaim instead presented a straightforward copyright infringement claim supported by a mountain of direct and indirect evidence. Thus, the objective reasonableness of the parties' legal and factual positions supports an award of attorney's fees for Epic Games's copyright infringement counterclaim.

As for the need for compensation and deterrence, both weigh heavily in favor of awarding attorney's fees to Epic Games. As explained, over a prolonged time period, Silicon Knights deliberately and repeatedly copied thousands of lines of Epic Games's copyrighted code, and then attempted to conceal its wrongdoing by removing Epic Games's copyright notices and by disguising Epic Games's copyrighted code as Silicon Knights's own. Silicon Knights's coverup forced Epic Games's attorneys, working with Epic Games's experts, to engage in significant discovery, pouring over millions of lines of code and thousands of pages of documents to uncover Silicon Knights's wrongdoing. Epic Games's attorneys then took significant pains to create trial exhibits and elicit

19

trial testimony that clearly demonstrated Silicon Knights's copyright infringement to the jury. Epic Games's attorneys also made significant efforts to reveal at trial the breadth and scope of Silicon Knights's coverup. Silicon Knights's wrongdoing unnecessarily raised Epic Games's legal fees. Moreover, Silicon Knights must be deterred from taking the same wrongful actions. Thus, the need for compensation and deterrence heavily favors awarding Epic Games attorney's fees for its copyright infringement counterclaim.

In sum, the record overwhelmingly supports an award of attorney's fees on the copyright infringement counterclaim. Accordingly, pursuant to section 505, the court awards Epic Games its reasonable attorney's fees for its copyright infringement counterclaim.

Third, Epic Games seeks attorney's fees for its trade secret misappropriation counterclaim based on North Carolina General Statute § 66-154(d). See Def.'s Mem. Supp. Mot. Attorney's Fees 6; Def.'s Reply Mot. Attorney's Fees 3–7. Section 66-154(d) provides that "if willful and malicious misappropriation exists, the court may award reasonable attorneys' fees to the prevailing party." N.C. Gen. Stat. § 66-154(d). "Willful means intentionally .... Willful is used in contradistinction to accidental or unavoidably." In re Pierce, 163 N.C. 247, 79 S.E. 507, 508 (1913); see Yancey v. Lea, 354 N.C. 48, 52, 550 S.E.2d 155, 157 (2001); Foster v. Hyman, 197 N.C. 189, 148 S.E. 36, 37 (1929); Allstate Ins. Co. v. Lahoud, 167 N.C. App. 205, 208–09, 605 S.E.2d 180, 183 (2004). "Malicious" means an action taken "in a manner which evidences a reckless and wanton disregard of the plaintiff's rights." Moore v. City of Creedmoor, 345 N.C. 356, 371, 481 S.E.2d 14, 24 (1997) (quotations omitted) (collecting cases). Whether to award attorney's fees under section 66-154(d) is committed to this court's sound discretion. See Bruning & Federle Mfg. Co. v. Mills, 185 N.C. App. 153, 155, 647 S.E.2d 672, 674 (2007).

Silicon Knights willfully misappropriated Epic Games's trade secrets. Silicon Knights

misappropriated 333 of Epic Games's trade secrets over the course of several years and in connection with several projects. See, e.g., Joint Amended Pretrial Order Part II.B ¶ 61; [D.E. 532-3] 32–34 & Ex. C; Def.'s Exs. 2391–92, 2394, 2508 (sealed), 2509 (sealed), 2510 (sealed); see also Def.'s Reply Mot. Attorney's Fees 6–7. Silicon Knights copied many of the trade secrets verbatim from Epic Games's code and transplanted them into Silicon Knights's code. See, e.g., Def.'s Exs. 2508 (sealed) (describing, in a comment left by a Silicon Knights employee, a particular Epic Games trade secret as being "ripped directly from Unreal"), 2509 (sealed) (same). Such extensive, repeated, and blatant misappropriation cannot be described as accidental or unavoidable. See Yancey, 354 N.C. at 52, 550 S.E.2d at 157; Allstate Ins., 167 N.C. App. at 208–09, 605 S.E.2d at 183. Rather, it was willful.

Silicon Knights's misappropriation also was malicious. Silicon Knights knew that Epic Games's Unreal Engine 3 ("UE3") code contained trade secrets. See, e.g., Pl.'s Ex. 1005 ¶ 6(b); Def.'s Ex. 2001 ¶ 6(b). Despite this knowledge, Silicon Knights repeatedly and deliberately copied significant portions of Epic Games's code containing trade secrets. Silicon Knights never bothered determining whether the code it copied represented an Epic Games trade secret. Silicon Knights simply "ripped" the code and the 333 trade secrets it encompassed "directly from [the] Unreal [Engine 3]," Def.'s Exs. 2508 (sealed), 2509 (sealed), and used it to create a competing product, Silicon Knights's own game engine. Conveniently, the trade secrets Silicon Knights misappropriated comprised the very code that Silicon Knights could not figure out how to write on its own. Silicon Knights's actions demonstrate "a reckless and wanton disregard of [Epic Games's] rights," and were therefore malicious. Moore, 345 N.C. at 371, 481 S.E.2d at 24.[6] Because Silicon Knights willfully

---

[6] Silicon Knights contends that its misappropriation was not malicious because Silicon Knights had reasonable grounds for disputing Epic Games's claimed trade secrets. Pl.'s Mem.

21

and maliciously misappropriated Epic Games's trade secrets, the court will award Epic Games its reasonable attorney's fees for its trade secret misappropriation counterclaim.

Having determined that Epic Games should not receive attorney's fees for its breach of contract counterclaim, and that Epic Games should receive reasonable attorney's fees for its copyright infringement and trade secret misappropriation counterclaims, the court must now determine a reasonable amount of attorney's fees to award Epic Games. When calculating attorney's fees, courts must "determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." Brodziak v. Runyon, 145 F.3d 194, 196 (4th Cir. 1998) (quotations and alteration omitted); see Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235, 243–44 (4th Cir. 2009); Grissom v. Mills Corp., 549 F.3d 313, 320–21 (4th Cir. 2008). Courts do so by applying the Johnson/Barber factors. See Hensley v. Eckerhart, 461 U.S. 424, 433–34 & n.9 (1983) (explaining lodestar calculations and approving the twelve-factor test set forth in Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974), overruled on other grounds by Blanchard v. Bergeron, 489 U.S. 87 (1989)); Barber v. Kimbrell's, Inc., 577 F.2d 216, 226 n.28 (4th Cir. 1978) (adopting Johnson's twelve-factor test).

The Johnson/Barber factors include:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and

---

Opp'n Mot. Attorney's Fees 12. At trial, Silicon Knights presented evidence on this issue. The evidence was wholly lacking, and the court rejects Silicon Knights's argument.

(12) attorneys' fees awards in similar cases.

Grissom, 549 F.3d at 321 (quotation omitted). Although the Johnson/Barber factors often are subsumed in the district court's determination of the lodestar figure, the court also may consider those factors in evaluating whether the lodestar figure is reasonable. Hensley, 461 U.S. at 434 n.9. However, a court need not list each Johnson/Barber factor or comment on those factors that do not apply. See, e.g., Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.), 86 F.3d 364, 376 (4th Cir. 1996).

As to the reasonableness of Epic Games's attorney's fees, Silicon Knights argues that "Epic [Games] asserted 1,442 trade secrets against [Silicon Knights]," but that "shortly before trial, Epic [Games] . . . claimed only 288 [sic] as misappropriated." Pl.'s Mem. Opp'n Mot. Attorney's Fees 13. Silicon Knights requests that it not be held responsible for Epic Games's attorney's fees associated with the 1,154 allegedly unasserted trade secrets. Id.

The court rejects Silicon Knights's argument. On October 24, 2007, Silicon Knights asked Epic Games, via interrogatory, to "[i]dentify each and every trade secret that [Epic Games] contend[s] is contained in, and/or encompassed by, any aspect of the Licensed Technology [(the UE3)] provided to Silicon Knights." [D.E. 78] 12 (sealed). In response, Epic Games argued that the interrogatory's broad scope was unduly burdensome, but stated that Epic Games would nonetheless "prepar[e] a list of its trade secrets and their respective locations that are relevant to this action." Id. 19 (sealed). Epic Games then prepared and provided a thirty-seven-page document listing the alleged trade secrets contained in the UE3's code. See [D.E. 106] 12. Silicon Knights, however, believed that the list was insufficiently detailed, and obtained a court order compelling Epic Games to disclose each specific trade secret, describe each trade secret in detail, and identify the location of each trade secret in the UE3's code. Id. 12–15. Complying with the court's order,

Epic Games, its attorneys, and its experts specifically disclosed 1,442 alleged trade secrets, along with a description and location of each. See Pl.'s Mem. Opp'n Mot. Attorney's Fees 13; Def.'s Reply Mot. Attorney's Fees 7. By its broadly worded interrogatory for a detailed list of "each and every trade secret" contained in "any aspect of the" UE3's code, [D.E. 78] 12 (sealed), Silicon Knights invited the increased attorney's fees about which it now complains. Holding Silicon Knights responsible for those attorney's fees is far from "fundamentally unfair." Pl.'s Mem. Opp'n Mot. Attorney's Fees 13. During discovery, Silicon Knights insisted on a list of "each and every trade secret" contained in "any aspect of the" UE3's code. [D.E. 78] 12 (sealed). Silicon Knights got its wish. Merely because Epic Games also identified 333 of the 1,442 trade secrets as those that Silicon Knights had misappropriated does not warrant a reduced fee.

Silicon Knights does not otherwise challenge the reasonableness of Epic Games's requested attorney's fees. See Pl.'s Mem. Opp'n Mot. Attorney's Fees 1–14. Thus, the court now turns to the lodestar and Johnson/Barber analysis to determine the proper attorney's fees award.

The court is very familiar with this case and has reviewed parties' submissions concerning Epic Games's motion for attorney's fees. The court also has independently calculated a lodestar figure and applied the relevant Johnson/Barber factors. The court finds that Epic Games's initial request for $2,201,813.51 would have been reasonable had Epic Games been able to recover its attorney's fees for all of its counterclaims.[7] As explained, however, Epic Games cannot recover attorney's fees for its breach of contract counterclaim. Thus, the court must reduce Epic Games's request to reflect only the attorney's fees Epic Games is entitled to recover. In doing so, the court

---

[7] The Kenyon, McCoy, and Packer declarations attached to Epic Games's memorandum [D.E. 815] were particularly helpful in analyzing the issue of attorney's fees. See [D.E. 815-2, 815-3, 815-4].

notes that the central objective when determining an attorney's fees award "is to do rough justice, not to achieve auditing perfection." Fox v. Vice, 131 S. Ct. 2205, 2216 (2011). Accordingly, "trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." Id.

Epic Games's breach of contract counterclaim (standing alone) was not a major focus of this case. Instead, Silicon Knights's affirmative claims, Epic Games's defenses to those claims, Epic Games's copyright infringement counterclaim, and Epic Games's trade secret misappropriation counterclaim dominated the case, including the parties' discovery, pretrial motions, and trial. In context, the parties spent relatively little time investigating, proving, or arguing about Silicon Knights's breach of the License Agreement. After reviewing the record (including the Kenyon declaration and all of the time records), the court finds that a five percent reduction in Epic Games's attorney's fees request is appropriate. In doing so, the court notes that the case has been pending for five years, that there are over 800 docket entries, and that this court is very familiar with the entire record. Cf. Fox, 131 S. Ct. at 2216 (noting a district court's superior understanding of the litigation). Accordingly, $2,091,722.83 represents a reasonable attorney's fees award in this case, and the court awards Epic Games that amount. In reaching this figure, the court has considered the time and labor expended, the difficulty of the questions raised, the skill required, the customary fees for like work, the amount in controversy, and the results obtained. The other Johnson/Barber factors are not particularly relevant in this case.

As for Epic Games's request for expert fees, Federal Rule of Civil Procedure 54(d)(1) provides that "costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). Pursuant to 28 U.S.C. § 1920(3), "costs" as used in Rule 54(d)(1) include

25

certain expert witness fees. See 28 U.S.C. § 1920(3).[8] Expert witness fees, however, are typically limited under 28 U.S.C. § 1821 to "an attendance fee of $40 per day for each day's attendance. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance." 28 U.S.C. § 1821(b). Epic Games, however, requests expert witness fees of $1,088,337.29, in excess of section 1821(b)'s per diem rate. See Def.'s Mot. Attorney's Fees 1.

In support, Epic Games first contends that paragraph 2(e)(iii) of the License Agreement permits the expert witness fees sought. Def.'s Mem. Supp. Mot. Attorney's Fees 2; Def.'s Reply Mot. Attorney's Fees 7–8. But the language of paragraph 2(e)(iii) belies Epic Games's argument. Under North Carolina law, interpreting a written and unambiguous contract is a question of law for the court. Briggs v. Am. & Efird Mills, Inc., 251 N.C. 642, 644, 111 S.E.2d 841, 843 (1960). When construing contractual terms, a contract's plain language controls. See, e.g., State v. Philip Morris USA Inc., 363 N.C. 623, 631–32, 685 S.E.2d 85, 90–91 (2009); Hodgin v. Brighton, 196 N.C. App. 126, 128–29, 674 S.E.2d 444, 446 (2009); Hemric v. Groce, 169 N.C. App. 69, 76, 609 S.E.2d 276, 282 (2005). Paragraph 2(e)(iii) states that Silicon Knights "hereby agrees to indemnify and hold harmless Epic [Games] from and against any expenses (including . . . reasonable fees of . . . expert witnesses) . . . suffered by Epic [Games] arising out of [Silicon Knights's] responsibility under" section 2 of the License Agreement. Pl.'s Ex. 1005 ¶ 2(e)(iii); Def.'s Ex. 2001 ¶ 2(e)(iii). The explicit references to "indemnify" and "hold harmless" unambiguously demonstrate that paragraph 2(e)(iii) is merely an indemnity clause. See N.C. Mut. Life Ins. Co. v. McKinley Fin. Servs. Inc., No. 1:03CV00911, 2005 WL 3527050, at *9–10 (M.D.N.C. Dec. 22, 2005) (unpublished); Dixie

---

[8] There were no court appointed experts in this case. Thus, 28 U.S.C. § 1920(6) does not apply.

Container Corp. v. Dale, 273 N.C. 624, 627–28, 160 S.E.2d 708, 711 (1968); Atl. Contracting & Material Co. v. Adcock, 161 N.C. App. 273, 280, 588 S.E.2d 36, 41 (2003); Smith v. Carolina Coach Co., 120 N.C. App. 106, 113–14, 461 S.E.2d 362, 366–67 (1995).

The express references to "indemnify" and "hold harmless" likewise reveal the scope of paragraph 2(e)(iii)'s protections. "As in the construction of any contract, the court's primary purpose in construing [the scope of an indemnity clause] is to ascertain and give effect to the intention of the parties, and the ordinary rules of construction apply." Dixie Container, 273 N.C. at 627, 160 S.E.2d at 711; see Atl. Contracting, 161 N.C. App. at 280, 588 S.E.2d at 41. Paragraph 2(e)(iii)'s use of "indemnify" and "hold harmless" shows that Silicon Knights and Epic Games intended paragraph 2(e)(iii) to shield Epic Games from losses or obligations incurred to third parties only. See Dixie Container, 273 N.C. at 627–28, 160 S.E.2d at 711; Atl. Contracting, 161 N.C. App. at 280, 588 S.E.2d at 41; Smith, 120 N.C. App. at 113–14, 461 S.E.2d at 366–67. As such, paragraph 2(e)(iii) cannot support awarding expert witness fees to Epic Games in this case. See N.C. Mut. Life Ins. Co., 2005 WL 3527050, at *9–10; Dixie Container, 273 N.C. at 627–28, 160 S.E.2d at 711; Atl. Contracting, 161 N.C. App. at 280, 588 S.E.2d at 41; Smith, 120 N.C. App. at 113–14, 461 S.E.2d at 366–67.

Opposing this conclusion, Epic Games argues that "the broad, unqualified scope of [paragraph] 2(e)(iii) . . . distinguishes" that paragraph from a typical indemnity clause. Def.'s Reply Mot. Attorney's Fees 8. Epic Games's references to breadth, however, cannot erase the plain language of paragraph 2(e)(iii). See Atl. Contracting, 161 N.C. App. at 279–80, 588 S.E.2d at 41. Furthermore, paragraph 2(e)(iii) is materially indistinguishable from the provision at issue in North Carolina Mutual Life Insurance Co. The indemnity clause in that case stated,

MGA agrees to indemnify, defend and hold harmless Company, its officers, agents

27

and employees, from and against any and all liability, loss, damage or expense, including extracontractual and punitive damages and attorney's fees, incurred in connection with claims or demands for damages of any nature whatsoever, to the extent it is the result of any act or omission, tort[ious] or otherwise, of MGA, its officers, agents or employees . . . .

N.C. Mut. Life Ins., 2005 WL 3527050, at \*9 (second alteration in original). Similarly, paragraph

2(e)(iii) states that Silicon Knights

hereby agrees to indemnify and hold harmless Epic [Games] from and against any expenses (including court costs and reasonable fees of attorneys, accountants and expert witnesses), claims, costs, action, demand, proceeding, award, liability, loss, and damages suffered by Epic [Games] arising out of [Silicon Knights's] responsibility under [section 2 of the License Agreement].

Pl.'s Ex. 1005 ¶ 2(e)(iii); Def.'s Ex. 2001 ¶ 2(e)(iii). The wording of the two indemnity clauses differs, but not materially. Paragraph 2(e)(iii) is an indemnity clause insulating Epic Games from a loss or obligation incurred to a third party only. See N.C. Mut. Life Ins., 2005 WL 3527050, at \*9–10. Thus, paragraph 2(e)(iii) does not permit Epic Games to recover its requested expert witness fees.

Second, Epic Games contends that 17 U.S.C. § 505 authorizes the court to award expert witness fees exceeding those provided in 28 U.S.C. § 1821(b). See Def.'s Mem. Supp. Mot. Attorney's Fees 3. Section 505 provides that "[i]n any civil action under [the federal Copyright Act], the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof." 17 U.S.C. § 505. Circuit courts are split on whether section 505 authorizes an expert witness fees award in excess of the $40.00 per diem limit provided in section 1821(b). Compare Artisan Contractors Ass'n of Am., Inc. v. Frontier Ins. Co., 275 F.3d 1038, 1038–40 (11th Cir. 2001) (per curiam) (not authorized), and Pinkham v. Camex, Inc., 84 F.3d 292, 295 (8th Cir. 1996) (per curiam) (same), with Twentieth Century Fox Film Corp. v. Entm't Distrib., 429 F.3d 869, 885 (9th Cir. 2005) (authorized).

28

In Crawford Fitting, the Supreme Court explained that

> Congress has made its intent plain in its detailed treatment of witness fees. [Courts] will not lightly infer that Congress has repealed [sections] 1920 and 1821, either through Rule 54(d) or any other provision not referring explicitly to witness fees. As always, where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.

Crawford Fitting, 482 U.S. at 444–45 (quotations and alteration omitted) (emphasis in original); see Henkel v. Chi., St. P., M. & O. Ry. Co., 284 U.S. 444, 447 (1932); 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2678 (3d ed. 1998). The Court's admonition in Crawford Fitting guides this court's decision in this case. Section 505 authorizes an award of "full costs," 17 U.S.C. § 505, but does not refer "explicitly to witness fees." Crawford Fitting, 482 U.S. at 445. Nor does the statute's reference to "full costs," 17 U.S.C. § 505, provide "clear" congressional intent to permit expert witness fees exceeding those authorized by sections 1821(b) and 1920. Crawford Fitting, 482 U.S. at 445 (emphasis in original); see Arista Records LLC v. Gaines, 635 F. Supp. 2d 414, 418–19 (E.D.N.C. 2009) (holding that the district court's discretion to award costs under section 505 is limited by section 1920). Accordingly, section 505 does not authorize the court to award expert witness fees exceeding those provided for in sections 1821(b) and 1920.

In short, Epic Games is not entitled to recoup expert witness fees in excess of those permitted under 28 U.S.C. §§ 1821(b) and 1920. Epic Games did not specify the amount of expert witness fees it claims under sections 1821(b) and 1920. Based on the information Epic Games provided, the court finds that, conservatively, Epic Games may recover $680.00 in expert witness fees, and awards Epic Games that amount in expert witness fees. See [D.E. 815-2] 256, 272, 288–89, 310.

IV.

Epic Games requests that the court amend the judgment under Federal Rule of Civil

29

Case 5:07-cv-00275-D   Document 862   Filed 11/07/12   Page 29 of 47

Procedure 59(e) to include $3,554,578.46 in prejudgment interest on Epic Games's breach of contract counterclaim. Def.'s Mot. Amend J. 1. Initially, Silicon Knights suggests that Rule 59(e) cannot be used to amend a judgment to include prejudgment interest. Pl.'s Mem. Opp'n Mot. Amend J. 1–2. However, Epic Games's request for prejudgment interest is properly classified as a request to amend the court's judgment, and is governed by Rule 59(e). See Kosnoski v. Howley, 33 F.3d 376, 378 (4th Cir. 1994); see also Osterneck v. Ernst & Whinney, 489 U.S. 169, 175 (1989) ("[U]nlike attorney's fees, which at common law were regarded as an element of costs and therefore not part of the merits judgment, . . . interest traditionally has been considered part of the compensation due plaintiff."); Hexion Specialty Chems., Inc. v. Oak-Bark Corp., No. 7:09-CV-105-D, 2012 WL 2458638, at *1 (E.D.N.C. June 27, 2012) (unpublished). Accordingly, the court rejects Silicon Knights's contrary suggestion and addresses Epic Games's request for prejudgment interest.

Awarding prejudgment interest is a "matter within the district court's discretion." Maksymchuk v. Frank, 987 F.2d 1072, 1077 (4th Cir. 1993); United States v. Gregory, 818 F.2d 1114, 1118 (4th Cir. 1987). A court should award prejudgment interest when doing so "serves the legitimate goals of making a party whole, or compensating the injured party for the loss of the use of money he would otherwise have had." Marlen C. Robb & Son Boatyard & Marina, Inc. v. Vessel Bristol, 893 F. Supp. 526, 540 (E.D.N.C. 1994); see EEOC v. Liggett & Myers, Inc., 690 F.2d 1072, 1074 (4th Cir. 1982). Because North Carolina law governs Epic Games's breach of contract counterclaim, the court looks to North Carolina law to determine whether to award prejudgment interest to Epic Games on that counterclaim. See Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 633 (4th Cir. 1999).

North Carolina General Statute § 24-5 provides that "[i]n an action for breach of contract . . . the amount awarded on the contract bears interest from the date of breach." N.C. Gen. Stat. § 24-

5(a). "If the parties have agreed in the contract that the contract rate shall apply after judgment, then interest on an award in a contract action shall be at the contract rate after judgment; otherwise, it shall be at the legal rate." Id. "The legal rate of interest [is] eight percent (8%) per annum for such time as interest may accrue, and no more." N.C. Gen. Stat. § 24-1; see Barrett Kays & Assocs., P.A. v. Colonial Bldg. Co., Inc. of Raleigh, 129 N.C. App. 525, 529, 500 S.E.2d 108, 111–12 (1998). A party is "entitled to interest from the date of the breach as a matter of law" only after "breach is established." Cap Care Grp., Inc. v. McDonald, 149 N.C. App. 817, 824, 561 S.E.2d 578, 583 (2002).

Opposing Epic Games's request for prejudgment interest, Silicon Knights argues that Epic Games has not, and cannot, identify reasonably certain dates on which Silicon Knights breached the License Agreement. Pl.'s Mem. Opp'n Mot. Amend J. 2–3; see also Def.'s Mem. Supp. Mot. Amend J. 4–5; Def.'s Reply Mot. Amend J. 3–4. A party prevailing on its breach of contract claim is entitled to interest from the date of breach. Thomas M. McInnis & Assocs., Inc. v. Hall, 318 N.C. 421, 431, 349 S.E.2d 552, 558 (1986). If the parties do not submit the issue to a jury, the court may determine the date of breach. Sockwell & Assocs., Inc. v. Sykes Enters. Inc., 127 N.C. App. 139, 143, 487 S.E.2d 795, 798 (1997); Metromont Materials Corp. v. R.B.R. & S.T., 120 N.C. App. 616, 618, 463 S.E.2d 305, 307 (1995). In doing so, the court may, but does not have to, select "the latest [date] on which breach could have been found." Taha v. Thompson, 120 N.C. App. 697, 703, 463 S.E.2d 553, 557 (1995); see Sockwell & Assocs., 127 N.C. App. at 143, 487 S.E.2d at 798. Evidence in the record must support the court's finding as to the date of breach. See Sockwell & Assocs., 127 N.C. App. at 143, 487 S.E.2d at 798.

The jury found that Silicon Knights breached the License Agreement by failing to pay licensing fees for The Box/Ritualyst, The Sandman, X-Men: Destiny, and Siren in the Maelstrom.

31

See [D.E. 802] 2 (finding that Silicon Knights was liable to Epic Games for $2,650,000.00 in damages, an amount equating to the unpaid licensing fees Silicon Knights owed Epic Games under the License Agreement for The Box/Ritualyst, The Sandman, X-Men: Destiny, and Siren in the Maelstrom); see also Pl.'s Ex. 1005, Ex. A; Def.'s Ex. 2001, Ex. A. The jury did not determine the specific date on which Silicon Knights breached the License Agreement with respect to each of those games. See [D.E. 802] 2. Thus, for each game, the court must determine the date on which the breach occurred. See Sockwell & Assocs., 127 N.C. App. at 143, 487 S.E.2d at 798; Metromont Materials, 120 N.C. App. at 618, 463 S.E.2d at 307. In doing so, the court has reviewed the record. Being conservative, the court relies on the dates provided in defendant's exhibit 2384 and the evidence that supports those dates. That evidence demonstrates that (1) on July 29, 2008, The Box/Ritualyst contained 20,259 lines of Epic Games's UE3 code, (2) on July 29, 2008, The Sandman contained 20,259 lines of Epic Games's UE3 code, (3) on November 11, 2008, X-Men: Destiny contained 16,065 lines of Epic Games's UE3 code, and, (4) on September 17, 2009, Siren in the Maelstrom contained 535 lines of Epic Games's UE3 code. See, e.g., Def.'s Ex. 2384; see Felton Tr. May 24, 2012 PM [D.E. 858-1] at 67–70. Because each of those games contained Epic Games's UE3 code by the dates indicated, each of those dates represents the date on which, according to the evidence presented at trial, Silicon Knights used the UE3 to develop those videogames. Under sections 2(a), 2(g), and Exhibit A of the License Agreement, Silicon Knights was required to pay Epic Games the contractually required licensing fee. Silicon Knights did not make those payments, however, and thereby breached the License Agreement. Accordingly, based on the evidence presented at trial, the court finds that (1) as to The Box/Ritualyst, Silicon Knights breached the License Agreement on July 29, 2008, (2) as to The Sandman, Silicon Knights breached the License Agreement on July 29, 2008, (3) as to X-Men: Destiny, Silicon Knights breached the License

32

Agreement on November 11, 2008, and, (4) as to Siren in the Maelstrom, Silicon Knights breached the License Agreement on September 17, 2009. The court will calculate prejudgment interest as of those dates.

The parties disagree on how to calculate prejudgment interest. The parties agree that the applicable interest rate is 1.5 percent per month. See Def.'s Mem. Supp. Mot. Amend J. 3; Pl.'s Mem. Opp'n Mot. Amend J. 4; accord Pl.'s Ex. 1005, Ex. A; Def.'s Ex. 2001, Ex. A. Epic Games, however, argues that the License Agreement requires compound interest. Def.'s Mem. Supp. Mot. Amend J. 3; Def.'s Reply Mot. Amend J. 5–6. Silicon Knights contends that the License Agreement requires simple interest. Pl.'s Mem. Opp'n Mot. Amend J. 3–4.

Typically, compound interest is not permitted unless otherwise specified by statute or by contract. See Cherokee Nation v. United States, 270 U.S. 476, 490 (1926) (collecting cases); Ronald J. & Dana Cohen Family Ltd. P'ship v. City of Capitals, Inc., 829 F.2d 36, 1987 WL 44680, at *1 (4th Cir. 1987) (per curiam) (unpublished) (collecting cases). Here, the "Payment Terms" provision in Exhibit A of the License Agreement provides that "[i]nterest shall accrue on all amounts not paid at a rate, calculated upon the unpaid balance, of the lesser of: (i) one and one-half percent (1.5%) per month; or (ii) the highest rate allowed by law." Pl.'s Ex. 1005, Ex. A; Def.'s Ex. 2001, Ex. A. Interest on "all amounts" and on "the unpaid balance" is considered compound interest. See Exxon Corp. v. Crosby-Miss. Res., Ltd., 40 F.3d 1474, 1488–89 (5th Cir. 1995) (per curiam); Texon Energy Corp. v. Dow Chem. Co., 733 S.W.2d 328, 331 (Tex. App. 1987); Fishburne v. Hartsfield Loan & Sav. Co., 38 Ga. App. 784, 145 S.E. 495, 495–96 (1928); cf. Ronald J. & Dana Cohen Family, 1987 WL 44680, at *1–2. Thus, for its breach of contract counterclaim, Epic Games is entitled to 1.5 percent interest, compounded monthly from the date of breach for The Box/Ritualyst, The Sandman, X-Men: Destiny, and Siren in the Maelstrom. Accordingly, the court awards Epic Games a total of

33

$2,302,147.96 in prejudgment interest on its breach of contract counterclaim, and will amend the judgment accordingly.

V.

In its motion for remittitur, Silicon Knights contends that Epic Games cannot recover damages for both its breach of contract counterclaim and its copyright infringement and trade secret misappropriation counterclaims. Pl.'s Mem. Supp. Mot. Remittitur 3–4. Specifically, Silicon Knights argues that the damages the jury awarded to Epic Games constitute double recovery, that Epic Games is entitled only to the damages awarded on its breach of contract counterclaim, and that the judgment should be amended accordingly. Id. 4.

In opposition to Silicon Knights's remittitur motion, Epic Games argues that the damages awarded for its breach of contract counterclaim did not overlap with the damages awarded for its copyright infringement and trade secret misappropriation counterclaims. Def.'s Mem. Opp'n Mot. Remittitur 1–3; see Epic Games Closing Tr. May 29, 2012 AM at 170–78. Specifically, Epic Games contends that, for its breach of contract counterclaim, the jury awarded only the unpaid licensing fees for The Box/Ritualyst, X-Men: Destiny, The Sandman, and Siren in the Maelstrom. See Def.'s Mem. Opp'n Mot. Remittitur 1–3. In contrast, for its copyright infringement and trade secret misappropriation counterclaims, Epic Games argues that the jury awarded only the ill-gotten profits Silicon Knights reaped from its copyright infringement and trade secret misappropriation as to The Box/Ritualyst, X-Men: Destiny, The Sandman, and Siren in the Maelstrom. Id. Because the damages Epic Games sought and received for its breach of contract counterclaim did not overlap with those it sought and received for its copyright infringement and trade secret misappropriation counterclaims, and because governing law permits the recovery of these distinct damages, Epic Games argues that remittitur is not appropriate. See id.

34

Epic Games's argument comports with the evidence, arguments, and legal principles in this case. In connection with Epic Games's breach of contract counterclaim, the court instructed the jury that Epic Games had to prove (1) that Silicon Knights and Epic Games entered into the May 10, 2005 license agreement, (2) that Silicon Knights breached either paragraph 2(a) or paragraph 2(g), or both, and (3) that Epic Games suffered damages as a proximate result of Silicon Knights's breach of paragraph 2(a) or paragraph 2(g), or both. See [D.E. 860-1] at 36. The breach of contract counterclaim concerned the unpaid licensing fees for The Box/Ritualyst, X-Men: Destiny, The Sandman, and Siren in the Maelstrom. As for damages on the breach of contract counterclaim, the court instructed the jury as to both nominal and actual damages. Id. at 38–39.

In connection with the copyright infringement counterclaim under the federal Copyright Act, the court instructed the jury (1) that Epic Games had to prove that Epic Games is the owner of a valid copyright or valid copyrights and (2) that Silicon Knights copied original elements from a version or versions of the Unreal Engine 3's computer code in which Epic Games owns a valid copyright. See id. at 39–40. The court then gave extensive instructions expounding on these two elements. See id. at 40–49. As for the trade secret misappropriation counterclaim under North Carolina's Trade Secrets Protection Act, the court instructed the jury that Epic Games had to prove (1) that Epic Games's proprietary information in the Unreal Engine 3's computer code constitutes a trade secret or trade secrets; (2) that Silicon Knights misappropriated Epic Games's trade secret or trade secrets, and (3) that Silicon Knights's misappropriation of Epic Games's trade secret or trade secrets resulted in the unjust enrichment of Silicon Knights. See id. at 49. The court then gave extensive instructions expounding on these elements. Id. at 49–55.

As for damages on the copyright infringement counterclaim and trade secret misappropriation counterclaim, the court instructed the jury:

35

If you find that Silicon Knights infringed a copyright or copyrights of Epic Games, or misappropriated a trade secret or trade secrets of Epic Games, then you must determine the amount of damages that Epic Games is entitled to recover. Epic Games is entitled to recover any of Silicon Knights'[s] net profits attributable to any copyright infringement or trade secret misappropriation by Silicon Knights. Therefore, you should [a]ward Epic Games Silicon Knights'[s] net profits only if you find that Epic Games proved a causal relationship between any copyright infringement or trade secret misappropriation and any net profits of Silicon Knights.

Net profits are the difference between total revenues and total expenses. Silicon Knights'[s] total revenue is all of Silicon Knights'[s] receipts from uses or sales of all works, if any, that infringe a copyright or copyrights of Epic Games or that misappropriate a trade secret or trade secrets of Epic Games. Epic Games has the burden of proving by a preponderance of the evidence Silicon Knights'[s] total revenues.

Silicon Knights'[s] total expenses are all operating costs and production costs incurred in producing Silicon Knights'[s] total revenue on all works, if any, that infringe a copyright or copyrights of Epic Games or that misappropriated the trade secret or trade secrets of Epic Games. Silicon Knights has the burden of proving by a preponderance of the evidence its total expenses.

To calculate total revenues and total expenses, you should begin by calculating the revenues and expenses associated with each of Silicon Knights'[s] works, if any, that infringes a copyright or copyrights of Epic Games or that misappropriates a trade secret or trade secrets of Epic Games. Once you have calculated Silicon Knights'[s] revenues and expenses for each of . . . those works, if any, you should add all the revenues together and add all the expenses together. The resulting sums will be Silicon Knights'[s] total revenues and total expenses. You should then subtract Silicon Knights'[s] total expenses from its total revenues. The resulting difference will be Silicon Knights'[s] net profits or net losses on all works, if any, that infringe a copyright or copyrights of Epic Games or that misappropriated a trade secret or trade secrets of Epic Games.

In making these calculations, you should attribute all of Silicon Knights'[s] revenue for any given work to any infringement or misappropriation committed by Silicon Knights, unless you find that a portion of Silicon Knights'[s] revenues derived from that work is attributable to factors other than Silicon Knights'[s] use of Epic Games'[s] copyrighted works or trade secrets. Silicon Knights has the burden of proving the portion of its revenues, if any, attributable to factors other than any infringement by Silicon Knights of Epic Games'[s] copyrighted work or works[,] or any misappropriation by Silicon Knights of Epic Games'[s] trade secret or trade secrets.

Finally, Epic Games seeks to recover Silicon Knights'[s] net profits on the

following four video game projects only[:] The Box/Ritualyst, X-Men: Destiny, The Sandman, and Siren in the Maelstrom. Accordingly, you should consider only those four video game projects when calculating revenues, expenses, [total revenues,] total expenses, and net profits.

See id. at 52–55. In addition, the court instructed the jury that Epic Games was not entitled to double recovery on the copyright infringement counterclaim and the trade secret misappropriation counterclaim. See id. at 55. Specifically, the court instructed the jury:

> When a party owns both a copyright and a trade secret in the same material, that party may not obtain a double recover[y] [when] the damages for copyright infringement and trade secret misappropriation are coextensive. In other words, if you find that Epic Games owned a copyright and a trade secret or trade secrets in the same material[,] and that the same actions by Silicon Knights infringed that copyright and misappropriated that trade secret or trade secrets, then Epic Games is entitled to recover damages for either Silicon Knights'[s] infringement of that copyrighted material or Silicon Knights'[s] misappropriation of that trade secret, but not for both.

Id.

Under the federal Copyright Act, Epic Games could have sought "to recover the actual damages suffered by [it] as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b); Walker v. Forbes, Inc., 28 F.3d 409, 412 (4th Cir. 1994). Epic Games, however, only sought Silicon Knights's ill-gotten profits. See [D.E. 860-1] at 39–49, 52–55. Likewise, under the North Carolina Trade Secrets Protection Act, Epic Games only sought "the unjust enrichment caused by misappropriation of a trade secret." N.C. Gen. Stat. § 66-154(b).

As noted, the jury awarded Epic Games $2,650,000.00 in actual damages on the breach of contract counterclaim and $1,800,000.00 on the copyright infringement and trade secret misappropriation counterclaims. See [D.E. 802]. The recovery on the breach of contract counterclaim served a different interest and was not based on the same conduct or proof as the conduct and proof giving rise to the recovery on the copyright infringement and trade secret

37

misappropriation counterclaims. The breach of contract counterclaim only made Silicon Knights pay the licensing fee due to Epic Games under the May 10, 2005 licensing agreement for The Box/Ritualyst, X-Men: Destiny, The Sandman, and Siren in the Maelstrom. In contrast, Epic Games's copyright infringement and trade secret misappropriation counterclaim only stripped Silicon Knights of the "profit generated as a result of the use of the infringed [code and misappropriated trade secrets]." Walker, 28 F.3d at 412. "By stripping the infringer . . . of the profit generated as a result of the use of the infringed item, [17 U.S.C. § 504(b)] makes clear that there is no gain to be made from taking someone else's intellectual property without their consent." Id.; see McRoberts Software, Inc. v. Media 100, Inc., 329 F.3d 557, 566–70 (7th Cir. 2003). Moreover, this court's conclusion that there is no double recovery in this case not only comports with 17 U.S.C. § 504(b), but also with North Carolina law. See, e.g., United Labs., Inc. v. Kuykendall, 335 N.C. 183, 191–94, 437 S.E.2d 374, 379–81 (1993). Finally, the court has reviewed the cases that Silicon Knights cited in its memorandum and reply and finds that the cited cases are distinguishable from the evidence, argument, and legal principles at issue in this case. Cf. Walker, 28 F.3d at 412 ("[G]iven the remarkable breadth of works eligible for copyright protection, and the numerosity of variables involved in determining loss and gain under each scenario, the experience of copyright damages has been one of case-by-case assessment of the factors involved, rather than application of hard and fast rules."). Accordingly, the court denies Silicon Knights's motion for remittitur.

## VI.

In its motion for a permanent injunction, Epic Games seeks to require Silicon Knights to remove from its systems all of Epic Games's copyrighted material and trade secrets, to enjoin Silicon Knights from distributing any product that contains Epic Games's copyrighted material or trade secrets, and to enjoin Silicon Knights from creating any product using Epic Games's copyrighted

38

material or trade secrets. See Def.'s Mot. Inj. 1–3; Def.'s Mem. Supp. Mot. Inj. 1–2. North Carolina General Statute § 66-154(a) provides that "actual . . . misappropriation of a trade secret . . . shall be permanently enjoined upon judgment finding misappropriation for the period that the trade secret exists plus an additional period as the court may deem necessary under the circumstances to eliminate any inequitable or unjust advantage arising from the misappropriation." N.C. Gen. Stat. § 66-154(a). The federal Copyright Act similarly permits a court to grant a permanent injunction "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a); Christopher Phelps & Assocs., LLC v. Galloway, 492 F.3d 532, 546–47 (4th Cir. 2007). Such an injunction may include "the destruction or other reasonable disposition of all copies . . . found to have been made or used in violation of the copyright owner's exclusive rights, and of all . . . articles by means of which such copies . . . may be reproduced." 17 U.S.C. § 503(b).

Epic Games and Silicon Knights agree that a permanent injunction is authorized and appropriate in this case. See Def.'s Mem. Supp. Mot. Inj. 6; Pl.'s Mem. Opp'n Mot. Inj. 1–5 (disputing the most reasonable scope of a permanent injunction, but failing to argue that a permanent injunction is altogether improper in this case). The parties, however, dispute the scope of the injunction. See Def.'s Mem. Supp. Mot. Inj. 6–8; Pl.'s Mem. Opp'n Mot. Inj. 2–5; Def.'s Reply Mot. Inj. 1–4.

The court has reviewed the parties' arguments, reviewed the entire record (including the License Agreement), and reflected on the nature and extent of Silicon Knights's copyright infringement and trade secret misappropriation. The court also has reflected on Silicon Knights's "code cleanup" effort and considered the nature of the video game and game engine industries. The court finds that injunctive relief is appropriate. Such relief prevents Silicon Knights from benefitting from its wrongdoing and continuing the irreparable harm to Epic Games. Such relief also comports

39

with the balance of hardships between Epic Games and Silicon Knights and is in the public interest. Thus, the court orders the following injunctive relief:

1.	Silicon Knights shall permanently cease using Epic Games's Licensed Technology (as defined in section 1(j) of the License Agreement).

2.	Silicon Knights shall remove all of Epic Games's Licensed Technology from Silicon Knights's game engine and, at Silicon Knights's expense, permit Epic Games (through its designated consultants) to independently verify that Silicon Knights's game engine no longer contains any of Epic Games's Licenced Technology. Silicon Knights also shall make available to Epic Games (through its designated consultants) Silicon Knights's computers, servers, databases, Perforce repositories, and any other systems, databases, data storage devices, internal wiki, data storage locations, directory listings, and equipment. Epic Games may access these items and Silicon Knights's premises to verify that Silicon Knights has fully complied with this permanent injunction.

3.	After Silicon Knights has removed all of Epic Games's Licensed Technology from Silicon Knights's game engine, and after Epic Games has, at Silicon Knights's expense, independently verified that Silicon Knights's game engine no longer contains any of Epic Games's Licensed Technology, Silicon Knights shall destroy the code for all prior versions of Silicon Knights's game engine in its possession.

4.	Silicon Knights shall comply fully with the obligations imposed by paragraph 10(c)(i) of the License Agreement. Silicon Knights, however, shall not fill any orders as discussed in paragraph 10(c)(i)(A) or keep copies "of the Licensed Technology or any portion thereof (whether modified) or not in its possession" as discussed in

40

paragraph 10(c)(i)(B).

5.  Not later than December 10, 2012, Silicon Knights shall destroy all versions of the Licensed Technology in its possession, including (but not limited to) the video game code and game engine code for Too Human, The Box/Ritualyst, The Sandman, X-Men: Destiny, and Siren in the Maelstrom, all other game code that was created using the Licensed Technology, all versions of the Unreal Engine 3, and all copies of any information obtained from the licensee restricted portions of the Unreal Developer Network.

6.  Silicon Knights shall cease producing or distributing Too Human, The Box/Ritualyst, The Sandman, X-Men: Destiny, and Siren in the Maelstrom, and shall recall and destroy (at the expense of Silicon Knights) all unsold copies of Too Human, The Box/Ritualyst, The Sandman, X-Men: Destiny, and Siren in the Maelstrom.

7.  Silicon Knights shall cease producing or distributing any product containing Epic Games's Licensed Technology, and shall recall and destroy (at the expense of Silicon Knights) any such products that remain unsold.

8.  Silicon Knights shall notify the court and Epic Games not later than December 21, 2012, and again on February 21, 2013, concerning its compliance with this injunction.

VII.

As for Silicon Knights's motion for judgment as a matter of law, Federal Rule of Civil Procedure 50 permits a court to grant a motion for judgment as a matter of law "after a party has been fully heard on an issue only if there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." Robinson, 560 F.3d at 240 (quotations

41

omitted); see Fed. R. Civ. P. 50(a)–(b); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149–51 (2000); Brown v. CSX Transp., Inc., 18 F.3d 245, 248 (4th Cir. 1994). When considering a motion under Rule 50, a court must review the entire record and examine the evidence in the light most favorable to the non-moving party. See, e.g., Reeves, 530 U.S. at 149–51; Brown, 18 F.3d at 248.

The court listened to the testimony and reviewed exhibits as Silicon Knights presented its affirmative case on and Epic Games defended against Silicon Knights's breach of contract claim. The court paid equally close attention to the testimony and exhibits as Epic Games presented its affirmative case on and Silicon Knights defended against Epic Games's counterclaims. On May 25, 2012, Silicon Knights moved for judgment as a matter of law on Epic Games's remaining counterclaims. See Tr. May 25, 2012 PM at 54. The court heard oral arguments from the parties that day, id. at 54–65, and took the motion under advisement to reflect on the evidence and arguments presented. Id. at 65. On May 29, 2012, the court denied Silicon Knights's motion for judgment as a matter of law. Tr. May 29, 2012 AM at 32. Since trial, the court has spent considerable time rereading the trial transcripts and reviewing the trial exhibits. On July 2, 2012, Silicon Knights renewed its motion for judgment as a matter of law on Epic Games's copyright infringement and trade secret misappropriation counterclaims, and on the related damages award. See Pl.'s Mot. J. as Matter of Law. Both parties fully briefed their positions. See Pl.'s Mem. Supp. Mot. J. as Matter of Law; Def.'s Mem. Opp'n Mot. J. as Matter of Law; Pl.'s Reply Mot. J. as Matter of Law.

In connection with Silicon Knights's renewed motion and the parties' corresponding filings, the court has again reviewed and reflected on the evidence and arguments presented. Viewing the record in the light most favorable to Epic Games under Rule 50, overwhelming evidence establishes

42

and supports Epic Games's copyright infringement and trade secret misappropriation counterclaims. Silicon Knights's arguments to the contrary are baseless. Accordingly, the court denies Silicon Knights's motion for judgment as a matter of law.

## VIII.

Epic Games seeks to compel complete responses to its post-judgment interrogatories and requests for production regarding Silicon Knights's past and present assets and finances. See Def.'s Mot. Compel 1–2; [D.E. 828-1] (providing the disputed interrogatories and requests for production, and Silicon Knights's responses to them). Federal Rule of Civil Procedure 37(a)(1) provides that a party may move to compel answers to interrogatories and responses to requests for production. See Fed. R. Civ. P. 37(a)(3)(B). Before a court may consider such a motion, the parties must meet and confer regarding the discovery requests and attempt in good faith to resolve the discovery dispute without court action. See Fed. R. Civ. P. 37(a)(1); Local Civil Rule 7.1(c). Silicon Knights contends that Epic Games failed to comply with Rule 37(a)(1) and Local Civil Rule 7.1(c). Pl.'s Mem. Opp'n Mot. Compel 2–3. The court has reviewed Silicon Knights's arguments and the corresponding exhibits. The court finds that Epic Games complied with its obligation to meet and confer and to attempt in good faith to resolve the discovery disputes at issue. Silicon Knights and Epic Games have simply reached an impasse as to the appropriate scope of post-judgment discovery regarding Silicon Knights's past and present assets and finances. Thus, the court addresses the merits of Epic Games's motion to compel.

Pursuant to Federal Rule of Civil Procedure 26(b)(1),

[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the

43

action. Relevant information need not be admissible at the trial if the discovery
appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1). Federal Rule of Civil Procedure 69(a)(2) provides that "[i]n aid of the
judgment or execution, the judgment creditor . . . may obtain discovery from any person—including
the judgment debtor—as provided in these rules." Fed. R. Civ. P. 69(a)(2).

"[D]iscovery rules are to be accorded a broad and liberal treatment to effect their purpose of
adequately informing the litigants in civil trials." Herbert v. Lando, 441 U.S. 153, 177 (1979); see
Hickman v. Taylor, 329 U.S. 495, 507 (1947). Accordingly, "[d]iscovery under the Federal Rules
of Civil Procedure is . . . freely permitted." Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.,
334 F.3d 390, 402 (4th Cir. 2003). A litigant, however, is not entitled to conduct discovery that is
intended to harass, annoy, embarrass, or oppress, or that causes undue burden or expense to the
opposing party. See Fed. R. Civ. P. 26(c). Nevertheless, the party opposing a motion to compel
must demonstrate why discovery should not be granted. SAS Inst. Inc. v. Akin Gump Strauss Hauer
& Feld, LLP, No. 5:10-CV-101-H, 2011 WL 6370482, at *2 (E.D.N.C. Dec. 20, 2011)
(unpublished); Mainstreet Collection, Inc. v. Kirkland's, Inc., 270 F.R.D. 238, 240 (E.D.N.C. 2010).
When evaluating a motion to compel discovery, the court enjoys broad discretion. See Carefirst of
Md., 334 F.3d at 402; Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 929
(4th Cir. 1995); Erdmann v. Preferred Research, Inc., 852 F.2d 788, 792 (4th Cir. 1988); LaRouche
v. Nat'l Broad. Co., Inc., 780 F.2d 1134, 1139 (4th Cir. 1986).

On June 20, 2012, Epic Games served on Silicon Knights fourteen interrogatories and sixteen
requests for production. See Def.'s Mot. Compel 2; Def.'s Mem. Supp. Mot. Compel 2; cf. [D.E.
828-1]. Epic Games's interrogatories and requests for production seek information and documents
concerning Silicon Knights's assets and finances from July 18, 2007, to the present. See [D.E. 828-

44

1]. On July 20, 2012, Silicon Knights responded. See Def.'s Mot. Compel 2; Def.'s Mem. Supp. Mot. Compel 2; cf. [D.E. 828-1]. Silicon Knights's responses to Epic Games's interrogatories and requests for production comprise nothing but a laundry list of boilerplate objections. See [D.E. 828-1]. Silicon Knights has failed to articulate any specific objection to any particular interrogatory or request for production, and therefore has waived any legitimate objection it otherwise could have raised. See McLeod, Alexander, Powel & Apffel, P.C. v. Quarles, 894 F.2d 1482, 1484–85 (5th Cir. 1990); Panola Land Buyers Ass'n v. Shuman, 762 F.2d 1550, 1558–59 (11th Cir. 1985); Josephs v. Harris Corp., 677 F.2d 985, 991–92 (3d Cir. 1982); Mainstreet Collection, 270 F.R.D. at 240; Kinetic Concepts, Inc. v. ConvaTec Inc., 268 F.R.D. 226, 247 (M.D.N.C. 2010) (collecting cases); Hy-Ko Prods. Co. v. Hillman Grp., Inc., No. 5:09-MC-00032, 2009 WL 3258603, at *1–2 (E.D.N.C. Oct. 8, 2009) (unpublished).

In addition to boilerplate objections, Silicon Knights also added specious responses to some discovery requests. For example, in response to Epic Games's eighth and ninth requests for production, Silicon Knights stated that, "[s]ubject to and without waiving any of [its] objections . . . , [Silicon Knights] will endeavor to identify and produce appropriately responsive documents." [D.E. 828-1] 41, 43. This vague, open-ended response merely "state[s] an intention to make some production at an unspecified date of [Silicon Knights's] own choosing[,] . . . is not a complete answer as required by Rule 34(b) and, therefore, pursuant to Rule 37(a)(3) is treated as a failure to answer or respond." Kinetic Concepts, 268 F.R.D. at 247 (quotation omitted); see Jayne H. Lee, Inc. v. Flagstaff Indus. Corp., 173 F.R.D. 651, 656 (D. Md. 1997).

Alternatively, even assuming Silicon Knights's objections to Epic Games's interrogatories and requests for production rise above the level of specious, boilerplate objections, those objections fail. Silicon Knights contends that Epic Games's interrogatories and requests for production are

45

overly broad and unduly burdensome because they seek information and documents pertaining to Silicon Knights's assets and finances before May 30, 2012, the date of judgment, rather than information and documents pertaining exclusively to Silicon Knights's current assets and finances. See Pl.'s Mem. Opp'n Mot. Compel 3–4.

Essentially, Silicon Knights makes a relevance objection. The standard for relevance during discovery differs from that during trial. See Fed. R. Civ. P. 26(b)(1). To be relevant during discovery, "information need not be admissible at the trial." Id. The requested information must simply be "reasonably calculated to lead to the discovery of admissible evidence." Id. Accordingly, relevance during discovery is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). The party opposing discovery bears the burden of showing that the requested information is not relevant.

Silicon Knights has not met its burden. Information and documents pertaining to Silicon Knights's prejudgment assets and finances is relevant to determining whether Silicon Knights has, in preparation for a possible judgment, secreted, hidden, wasted, or otherwise improperly disposed of assets. See Caisson Corp. v. Cnty. West Bldg. Corp., 62 F.R.D. 331, 334 (E.D. Pa. 1974); Monticello Tobacco Co. v. Am. Tobacco Co., 12 F.R.D. 344, 345 (S.D.N.Y. 1952). "In aid of the judgment or execution," Epic Games may discover this information. Fed. R. Civ. P. 69(a)(2). Accordingly, the court grants Epic Games's motion to compel complete responses to its interrogatories and requests for production. Silicon Knights shall provide complete responses to the requested discovery not later than December 3, 2012.

46

IX.

In sum, the court DENIES Silicon Knights's motion to stay [D.E. 808]. The court GRANTS IN PART and DENIES IN PART Epic Games's motion for costs [D.E. 813], GRANTS IN PART and DENIES IN PART Silicon Knights's motion to disallow costs [D.E. 838], and awards Epic Games $277,852.13 in costs. The court GRANTS IN PART and DENIES IN PART Epic Games's motion for attorney's fees and expert witness fees [D.E. 814], awards Epic Games $2,091,722.83 in attorney's fees, and awards Epic Games $680.00 in expert witness fees. The court GRANTS IN PART and DENIES IN PART Epic Games's motion to amend the judgment [D.E. 816] and amends the judgment [D.E. 804] to reflect $2,302,147.96 in prejudgment interest on Epic Games's breach of contract counterclaim. The court DENIES Silicon Knights's motion to alter the judgment by remittitur [D.E. 818]. The court GRANTS IN PART and DENIES IN PART Epic Games's motion for a permanent injunction [D.E. 820] and ORDERS the injunctive relief described in this order. The court DENIES Silicon Knights's motion for judgment as a matter of law [D.E. 824]. The court GRANTS Epic Games's motion to compel [D.E. 828]. Silicon Knights shall provide complete responses to the requested discovery not later than December 3, 2012. Finally, the court GRANTS Epic Games's two motions to seal [D.E. 823, 833]. The court retains jurisdiction to ensure compliance with its injunction and this order.

SO ORDERED. This 7 day of November 2012.

JAMES C. DEVER III
Chief United States District Judge

47